674 P.2d 1358

**STATE of Arizona, Appellee,**

v.

**Edward Ronald HEIN, Appellant.**

No. 5696.

Supreme Court of Arizona,
En Banc.

Dec. 2, 1983.

Robert K. Corbin, Atty. Gen. by William J. Schaefer, III and Robert S. Golden, Asst. Attys. Gen., Phoenix, for appellee.

Paul E. Hunter, Yuma, for appellant.

HAYS, Justice.

On April 16, 1982 appellant Edward Hein, Jr., and his codefendant Daniel Crivellone attempted to rob a Circle K convenience store in Ehrenberg, Arizona. During the attempt, Crivellone shot and killed the store clerk. Both Crivellone and appellant Hein were convicted of felony-murder, attempted armed robbery, and conspiracy to commit armed robbery. Both were sentenced to life imprisonment without possibility of parole for twenty-five years for the first degree murder convictions, fifteen years imprisonment for the attempted armed robbery convictions, and fourteen years imprisonment for the conspiracy convictions. All sentences for both defendants were ordered to run concurrently. Hein appeals his conviction, alleging that the arresting officers did not have probable cause to arrest, that his *Miranda* rights were violated, that his

confessions were involuntary, and that he received ineffective assistance of counsel. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. § 13–4031, and A.R.S. § 13–4035.

PROBABLE CAUSE

Hein first alleges that he was arrested without probable cause and that the fruits of that arrest—the gun with which the crime was committed, ammunition, and confessions—should have been suppressed. Hein and Crivellone were arrested in Las Vegas, Nevada on April 18, 1982, two days after the shooting at the Ehrenberg Circle K. The Las Vegas officers acted pursuant to an "attempt to locate" ("A.T.L.") request issued by Officer Michael Newman of the Yuma County Sheriff's Department. No one questions that the Las Vegas officers were entitled to act based upon the A.T.L. *See, e.g., State v. Everett,* 110 Ariz. 429, 431, 520 P.2d 301, 303, *cert. denied,* 419 U.S. 880, 95 S.Ct. 144, 42 L.Ed.2d 120 (1974); *State v. Richards,* 110 Ariz. 290, 291–92, 518 P.2d 113, 114–15 (1974). The question is whether the information known by Officer Newman at the time of the arrest amounted to probable cause. We conclude that it did.

Officer Newman arrived at the Ehrenberg Circle K on April 16, 1982, at approximately 6:30 a.m., shortly after two deputies of the Riverside County (California) Sheriff's Department had arrived at the scene. Officer Newman learned that one of those deputies, Deputy Luis Ferreira, had spoken to the victim during his last moments of consciousness. The victim had indicated there were two suspects, both young Caucasians. Deputy Ferreira showed Officer Newman a .22-caliber shell casing found on the floor near one of the cash registers. This shell had an "F" mark on it, indicating it was a Federal brand.

In addition to these facts, the Riverside deputies informed Officer Newman that between one and one-half hours before the shooting, a suspicious circumstance involving two young white males had been reported from a Circle K store in Blythe, California, only a few miles from the Ehrenberg

store. Upon inquiring with Blythe authorities, Newman learned that the Blythe incident involved two young white males who entered the store and began to play video games. When the store clerk and store owner noticed one of the persons had what appeared to be a gun barrel or tire iron sticking out of his sleeve, the clerk called the police. Upon seeing the clerk on the telephone, the suspects left the store. The clerk observed the car as it was leaving and noted the license plate number. Newman received from the Blythe authorities the store clerk's description of the suspects and the automobile, and the license plate number (Oregon KTA–548).

By checking the national crime computer, Officer Newman shortly thereafter learned that the automobile with Oregon license number KTA–548 was listed as a missing vehicle with missing juveniles as occupants. The computer missing persons report identified the juveniles as Edward Hein and Daniel Crivellone. The report, combined with a discussion with a Detective Peterson of the Clackamas County (Oregon) Sheriff's Department, revealed that the descriptions of Hein and Crivellone matched those of the persons seen at the Blythe Circle K. These sources also revealed that the youths had stolen a Sterling automatic .22-caliber handgun from Hein's father.

In early afternoon of the 16th, Newman contacted appellant Hein's father. The resulting conversation revealed that in addition to the gun, the suspects had taken .22-caliber "F" Federal brand ammunition. Newman then spoke to Crivellone's father and received a more detailed description of the automobile. That same afternoon Newman learned the autopsy of the victim showed a .22-caliber bullet caused the death.

Finally, Newman contacted a Mr. Griffith. Mr. Griffith delivers the Los Angeles Times to several locations in the Ehrenberg area, including the Ehrenberg Circle K. Mr. Griffith stated that when delivering papers that morning (the morning of the shooting) he arrived at the Ehrenberg Circle K at about 5:30 and observed a car with

Oregon plates parked in the Circle K parking lot. Mr. Griffith's description of the vehicle basically matched the description of the vehicle seen at the Blythe store.

■ We conclude that this information, known by Officer Newman at the time of the arrest, was sufficient to support a warrantless arrest. To be lawful a warrantless arrest must be based on probable cause. The arresting officers must have probable cause to believe a felony has been committed and that the person to be arrested committed it. A.R.S. § 13–3883. Probable cause exists when the facts and circumstances known at the time of the arrest are sufficient to lead a reasonable person to believe a felony was committed by the person to be arrested. *State v. Sardo,* 112 Ariz. 509, 515, 543 P.2d 1138, 1144 (1975).

■ At the time of the arrest, Officer Newman knew the following information: death was caused by a .22-caliber bullet, and the suspects were carrying a .22-caliber gun; a .22-caliber Federal brand casing was found at the scene of the crime, and the suspects had in their possession Federal brand .22-caliber ammunition; the description of the persons seen at the Blythe Circle K matched the description in the Oregon missing persons report, and both descriptions were consistent with the information given by the victim; the description of the vehicle at the Blythe Circle K matched the description in the Oregon report and the description of the vehicle seen at the Ehrenberg Circle K the morning of the shooting; the license plate number of the automobile seen at the Blythe Circle K matched that of the vehicle listed in the Oregon missing vehicle report. This information is sufficient to lead a reasonable person to believe the suspects were the ones who had committed the felony.

## MIRANDA WARNINGS

Hein next asserts that at the arrest his *Miranda* warnings were not timely given. On the day of the arrest, Las Vegas Officer Martin Lehtimen spotted the suspects' vehicle. When Lehtimen recognized the vehicle to be one listed on the police department "hotsheet," and one about which he had been briefed that morning, he called for assistance. Three officers—Bechtol, Hefner and Brunz—arrived and helped Lehtimen stop the car. The officers ordered Hein and Crivellone to leave the car and lie face down on the ground. Hein and Crivellone complied, lying within a few feet of the car doors, which remained open. Officer Lehtimen took care of Crivellone and Officer Hefner frisked Hein. Officer Bechtol first assisted Lehtimen and then Hefner.

During the frisk, when it appeared that no weapon would be found on Hein's person, Officer Hefner posed the following question to Hein: "Where is the gun?" Hein answered that it was in the car under the seat. Hefner finished frisking Hein and secured (handcuffed) him. Hefner then gave Hein his *Miranda* warnings. During the frisk, Officer Bechtol assisted in controlling Hein, standing a few feet from Hein with his (Bechtol's) shotgun pointed toward Hein's head.

Upon Hein being secured, Bechtol started searching for the gun. Hefner joined in the search after giving Hein the *Miranda* warnings. Officer Bechtol, who testified that the statement he heard from Hein in response to Officer Hefner's question was merely that the gun was "in the car," found Federal brand ammunition in the glove box. The gun, however, was not found during this quick initial search. Officer Bechtol then asked Hein where the gun was. Hein responded that it was under the passenger seat. Bechtol then went directly to the passenger seat and found the weapon. All these events took place within a minute or so of the stop.

■ Hein asserts that his fifth and sixth amendment rights were violated in that custodial interrogation began and a damaging statement was given before the *Miranda* warnings were provided. The state argues that on-the-scene questioning for safety, not interrogation, purposes is permissible without first giving the *Miranda* warnings, and that therefore the question

"Where is the gun?" and Hein's reply were properly admitted at trial. The state asserts that the safety purpose of the question is demonstrated by the fact that the question was asked before Hein was handcuffed and while he was lying only a few feet from the open car door. The state urges that there was a chance Hein could have reached into the car and retrieved the gun. Further, Officer Hefner testified that when he asked the initial question he was concerned for his safety.

The facts of this case cannot allow us to agree that the officers' safety was in jeopardy when the question was asked. When Officer Hefner approached Hein he was lying face down on the ground with his arms outstretched. The officers at the scene had their shotguns cocked. Officer Hefner approached Hein, placed his shotgun on top of the suspects' car, then crouched over Hein and began to frisk him. When Hefner asked the question he held one of Hein's arms behind his back and was ready to handcuff the other. During this time Officer Bechtol stood a few feet from Hein with shotgun poised. The officer's safety was not in jeopardy sufficiently to allow questioning before giving the *Miranda* warnings.

Further, the fruit of the poisonous tree doctrine, *see Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), compels us to conclude that the question by Officer Bechtol and Hein's reply, both occurring after the *Miranda* warnings were provided, also should not have been admitted at trial. The second question and reply were too closely related to Officer Hefner's *pre-Miranda* questioning for us to conclude they were not the exploitation of that original improper act. *See id.* at 488, 83 S.Ct. at 417.

Although constitutional violations occurred during the arrest, the evidence obtained during the search of the car, including the gun and the ammunition, was admissible. Arizona follows the inevitable discovery rule. *See State v. Lamb,* 116 Ariz. 134, 138, 568 P.2d 1032, 1036 (1977). Under *New York v. Belton,* 453 U.S. 454, 460, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981), an officer making a lawful custodial arrest of an occupant of an automobile may, as a contemporaneous incident to that arrest, search the passenger compartment of that automobile. Thus, even without the information given by Hein at the arrest site, the officers lawfully could have made a thorough search of the car and inevitably would have discovered the gun and ammunition.

Finally, although the trial court improperly admitted Hein's statements made at the scene of the arrest, reversal is not required. A constitutional error is harmless if it can be said beyond a reasonable doubt that the error did not alter the verdict of the jury. *State v. Montes,* 136 Ariz. 491, 497, 667 P.2d 191, 197 (1983). In the present case the evidence of guilt was overwhelming. The information known at the time of the arrest (discussed *supra* in the Probable Cause section) plus subsequent confessions (*see infra*) left Hein's guilt in no doubt.

## VOLUNTARINESS OF CONFESSIONS

Hein next contends that his confessions were involuntary. In Arizona, confessions are presumed to be involuntary. The burden is on the state to demonstrate by a preponderance of the evidence that the confessions were freely and voluntarily made, not the product of physical or psychological coercion. In making its determination, the trial court must examine the totality of the circumstances. The trial court's determination will not be upset on appeal absent clear and manifest error. *State v. Arnett,* 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978).

Shortly after the arrest Hein was taken to the detective bureau at the Las Vegas Police Department. No conversation took place between Hein and the escorting officer, Officer Bechtol, on the way to the police station. Within a half hour after arriving at the station, Hein was interviewed by Detective David Hatch. Also

present at the interview were Officers Hefner and Bechtol.

Before questioning about the Ehrenberg shooting began, Hein was read his rights. In addition, Hein himself read aloud his rights from a "rights card," and then signed the card. Detective Hatch began tape recording the interview and then asked Hein whether he understood his rights. Hein answered affirmatively and then confessed to the crime. The tape recording was then transcribed by a stenographer, and Hein signed the transcribed copy. The entire interview process lasted less than one-half hour.

During the meeting with Detective Hatch, Hein agreed to talk with Yuma County authorities. Officer Newman of the Yuma County Sheriff's Department arrived that afternoon. Before questioning, Newman advised Hein of his rights, and had Hein himself read his rights and sign a waiver form. The interview was tape-recorded. Officer Newman testified that Hein was given no promises or threats, and was not forced to talk. Hein's statement during this interview was essentially the same as that taken by Detective Hatch.

Hein urges that the combination of events at the arrest and "psychological coercion" of the questioning process yielded involuntary confessions. Hein testified he was promised that if he gave information "it would go easier on me," and that he made a statement because he was scared and because there were three officers with pistols in the interview room.

We find that the trial court was not in error in ruling the confessions to be admissible at trial. Hein was the only person to testify that any type of benefits were promised; all other persons' testimony consistently indicated that no such promises were made. Further, it is understandable that Hein was frightened. Any atmosphere in which a person is questioned about his involvement in a homicide will seem somewhat coercive and frightening. The totality of the circumstances indicates, however, that the confessions were products of a free will, not an overly coercive atmosphere.

Evidence of voluntariness abounds. There is no indication of physical abuse, threats, or force. Hein was in custody only a short time before questioning began. Both interviews were brief. Hein made two separate but consistent statements. In addition, each confession occurred only after a full advisement and written waiver of rights. Finally, the interviews were tape-recorded, the interview with Detective Hatch was transcribed by a stenographer, and Hein read and signed the transcribed copy. Both confessions by Hein on the day of his arrest were correctly ruled admissible as evidence at trial.

 Finally, the confessions need not have been excluded under the fruit of the poisonous tree doctrine. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The test under *Wong Sun* is whether the evidence in question was procured by "exploitation of th[e] illegality" or by means "sufficiently distinguishable to be purged of the primary taint." *Id.* at 488, 83 S.Ct. at 417 (quoting Maguire, *Evidence of Guilt,* 221 (1959)). The circumstances of this case indicate the confessions were not obtained by exploitation of the illegality at the arrest site: Hein was not questioned during the trip to the police station; while at the station Hein was questioned only after repeatedly being advised of his rights; Hein was held at the station only a brief period before being advised of his rights; all questioning was brief; the statements made by Hein at the stop were not referred to during the questioning; and all questioning was conducted in as noncoercive an atmosphere as possible.

## EFFECTIVE ASSISTANCE OF COUNSEL

 Hein alleges that he received ineffective assistance of counsel. Hein argues that the attorneys who worked on his case "fail[ed] to negotiate properly and . . . fail[ed] to interview and counsel the client substantially before trial which resulted in the client losing faith in his counsel completely and the client being unprepared as a

witness in his trial." At the outset we note that the standard to determine whether an accused received effective assistance of counsel is whether "under the circumstances the attorney showed at least minimal competence in representing the criminal defendant." *State v. Watson,* 134 Ariz. 1, 4, 653 P.2d 351, 354 (1982).

With regard to his claim that his attorneys failed to negotiate properly, Hein asserts that by failing to request an evidentiary hearing to be held before the date of the trial (instead of the same day the trial was to begin), his attorneys failed to develop an advantageous bargaining position that perhaps could have forced the state to accept a plea of second degree murder. This advantageous position assertedly would have developed from (1) the possibility the motion to suppress would be granted, thereby weakening the state's case, and (2) the fact that many of the state's witnesses were from out-of-state, thus placing on the state greater expense, time, and effort in bringing the witnesses before the court on two occasions, once for the hearing and once for the trial.

We find no merit in the claim that Hein's attorneys failed to negotiate properly. First, the possibility that the motion to suppress would have been granted, and thereby the possibility that the state's case would be weakened, confronted the state regardless of when the hearing was to be held. In addition, by arguing that the state would be more disposed to bargain if the hearing were to have taken place before the date of the trial, appellant urges us to indulge in conjecture, but has made no showing that the state, even if confronted with such a situation, would have considered accepting a lesser plea. To the converse, the record indicates that the state thought it had an overwhelming case and was therefore unwilling to negotiate.

 Appellant contends that if the hearing were set for a date before the trial date, the state would have been more willing to bargain because of the burden of producing out-of-state witnesses on two occasions instead of one. Appellant has not shown, however, that the trial court would have agreed to an earlier hearing date and, because of the number of out-of-state witnesses, it is probable that the court would not have set such a date. Moreover, the purpose of a pretrial suppression hearing is to determine whether an accused's constitutional rights were violated, not to create leverage so that one party can force another to agree to a bargain the latter otherwise would not accept. Although bargaining between prosecution and defense counsel is a common practice, we cannot hold that as a matter of law failure to use the timing of a pretrial motion as a bargaining tool results in ineffective assistance of counsel.

 Concerning Hein's claim that he was inadequately counseled before trial, Hein first argues that lack of pretrial counseling destroyed his belief, faith, and trust in his counsel. Hein's counsel for this appeal asserts that Hein had no confidence in his trial counsel and was therefore unlikely to cooperate with him, and that Hein was "completely removed as an intelligent source of facts necessary to the defense counsel in order to prepare a proper defense." This contention is simply not supported by the record. The record shows that Hein's counsel at trial, Charles Ledsky, talked with Hein the evening before trial for between 45 minutes and one hour, and that during the suppression hearing, which lasted for two days, Ledsky talked with Hein at least twice for 45 minutes each time. Further, at the hearing on motion for new trial, the following colloquium took place between Mr. Frank Dawley, attorney for the state, and appellant Hein:

Q. Did you get along with Mr. Ledsky during the trial?

A. Yes.

Q. Have any arguments?

A. No.

Q. Disagree about any kind of strategy?

A. No, not really.

Q. Did he explain to you what was happening?

A. Somewhat, yes.

Q. Did you ask him questions if you didn't understand?

A. Yes.

Q. In other words, there was communication going back and forth between yourself and him; right?

A. Yes.

Based upon this evidence in the record, we do not find that there was a lack of cooperation by Hein.

■ Hein's final argument is that inadequate pretrial counseling left him unprepared as a witness. The record shows that before Hein testified at the suppression hearing Ledsky discussed the case with Hein, and that before Hein testified at trial Ledsky had discussed Hein's role with him on several occasions. We cannot say that such actions by Ledsky fell below the *Watson* minimal competence standard. A finding of ineffective assistance of counsel cannot rest merely on the fact that counsel did not consult extensively with his client. Appellant does not identify any evidence or defenses counsel should have discovered and presented; instead, appellant states that "[t]he full effects of the failure to promptly and repeatedly interview the young defendant-witness as soon as counsel was retained upon the case will never be known." We will not engage in such conjecture. *See, e.g., State v. Austin,* 124 Ariz. 231, 232, 603 P.2d 502, 503 (1979), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1841, 64 L.Ed.2d 264 (1980).

Although not briefed by the parties, one final issue was raised during oral argument and must be resolved. That issue is whether the sixth amendment entitles a person to demand continued representation by a particular retained attorney.

Shortly after Hein was arrested, his parents retained Henry Florence to represent Hein. Florence met with Hein soon thereafter. Two other attorneys from Florence's four-person firm also worked on the Hein case. One of those attorneys, Charles Ledsky, represented Hein at trial.

On the morning trial was to begin, Hein approached the bench and complained about being represented by Ledsky instead of Florence. Hein asserted that Florence, not Ledsky, was his lawyer, and that he wanted Florence personally to represent him. Hein also gave the judge a letter, written by a jailhouse lawyer, to the same effect.

The judge conducted an off-the-record discussion with Hein and Ledsky. The court apparently interpreted Hein's complaint as a motion for a continuance, *see, e.g., Morris v. Slappy,* —— U.S. ——, ——, 103 S.Ct. 1610, 1613, 75 L.Ed.2d 610 (1983), and denied the motion. Ledsky then represented Hein throughout the trial.

■ It is axiomatic that an accused enjoys the right to assistance of counsel for his defense. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). Implicit in this guarantee is the right to be represented by counsel of one's choice. *Powell v. Alabama,* 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). It is also axiomatic that a motion for a continuance is directed to the discretion of the trial court, and that court's ruling will not be disturbed absent a clear abuse of discretion. *State v. Sullivan,* 130 Ariz. 213, 215, 635 P.2d 501, 503 (1981). The trial court is accorded this discretion because it is the only unbiased party in a position to observe the proceeding. *State v. Jackson,* 112 Ariz. 149, 154, 539 P.2d 906, 911 (1975). Thus, the trial court is the only party in a position to judge the inconvenience of a continuance to the litigants, counsel, witnesses, and the court, and further is the only party in a position to determine whether there are "extraordinary circumstances" warranting a continuance and whether "delay is indispensible to the interests of justice." 17 A.R.S. Rules of Criminal Procedure, rule 8.5(b).

■ Blending an appreciation of the inevitable difficulties of trial administration with a concern for constitutional protections, it has become established that "[d]esirable as it is that a defendant obtain private counsel of his own choice, that goal must be weighed and balanced against an equally desirable public need for the efficient and effective administration of justice." *United States ex rel. Carey v. Run-*

*dle,* 409 F.2d 1210, 1214 (3rd Cir.1969). Thus, the right to choice of counsel is not absolute, but is subject to the requirements of sound judicial administration. *State v. George,* 100 Ariz. 350, 353, 414 P.2d 730, 732 (1966).

In the present case, the court's discussion with Hein and Ledsky, and the court's decision not to grant the continuance, were off the record. Thus, at the time the court made its decision, it did not set forth in the record reasons for denying the request. It would have been better for our review if the court at the time it made its decision had given specific reasons in the record. *United States v. Burton,* 584 F.2d 485, 499 n. 47 (D.C.Cir.1978). However, examining all the facts, including the reasons given by the court in its ruling on motion for new trial for denying the continuance request, we are satisfied that the trial court perceived the salient factors and evaluated them in a manner within its proper zone of discretion. *Id.* at 497.

Whether an accused's constitutional rights are violated by the denial of a request for a continuance depends on the circumstances present in the particular case. *United States v. Casey,* 480 F.2d 151, 152 (5th Cir.), *cert. denied,* 414 U.S. 1045, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973). Some of the factors to be considered are: whether other continuances were granted; whether the defendant had other competent counsel prepared to try the case; the convenience or inconvenience to the litigants, counsel, witnesses, and the court; the length of the requested delay; the complexity of the case; and whether the requested delay was for legitimate reasons or was merely dilatory. *Burton, supra,* 584 F.2d at 490–91.

In the case at bar, two continuances already had been granted. The original trial date of June 17, 1982 was changed to July 13, 1982, and then to July 20, 1982. Also, in its ruling on the motion for new trial, the court noted that when denying the motion for a continuance it considered that the time limits on the defendant's right to a speedy trial were approaching.

The next circumstance to be considered, whether the defendant had other competent counsel prepared to try the case, was present in this case. "If the defendant has other competent counsel prepared for trial, then the court, when considering all the factors, need not tolerate as much inconvenience as in the case where defendant has no other counsel prepared to go to trial." *Burton, supra,* 584 F.2d at 498 n. 46. In this case, Mr. Ledsky assured the court he was prepared for trial.

The third factor to be examined is the convenience or inconvenience of the continuance to the litigants, counsel, witnesses, and the court. As noted by the trial court in its ruling on motion for new trial, Hein's codefendant Crivellone was ready and "anxious" to go to trial. Further, Mr. Dawby, counsel for the state, and Mr. Irwin, counsel for Crivellone, were ready for trial. In addition, most of the witnesses were from out of state. To continue the trial would have created a great burden on them. Also, the jury was present and ready to be sworn. Finally, as noted above, the time limits on the right to speedy trial were approaching.

The fourth circumstance is the length of the requested delay. It is not clear from the record whether the possible length of delay was ever discussed. We merely note that Mr. Ledsky testified that he was assigned to the Hein case when it became clear there would be a scheduling conflict for other members of the Florence firm.

The fifth factor to be considered is the complexity of the case. This case was not complex. The facts were straightforward, and the evidence of guilt was overwhelming. There was very little question that the police had acted properly. As Mr. Florence testified at the hearing on motion for new trial, the best that could be done for the defendant was to try to negotiate a second degree murder plea.

The final circumstance is whether the requested delay was for legitimate reasons or was merely dilatory. No one doubts the genuineness of Hein's complaint. It clearly was not merely a dilatory tactic. Neverthe-

less, that fact does not by itself make the trial court's ruling improper. Rather, that fact must be examined in light of all other considerations.

In addition to the circumstances discussed *supra,* we note that employment of one member of a law firm is employment of the firm, unless there is a special understanding to the contrary. Thus, under a contract without such a special understanding, any member of the firm may attend to the business entrusted to the firm, and the client does not have the right to demand that any particular member of the firm conduct the litigation. *E.g., Sellers v. State,* 56 Ala.App. 367, 321 So.2d 706 (1975). At the hearing on motion for new trial, there was conflicting testimony as to whether only Florence himself was hired or whether Florence indicated at the meeting at which he was retained that if the case went to trial someone else in the firm would probably handle the trial. In the court's ruling on motion for new trial, the court found that "the evidence is not such that [Hein] had the absolute right to expect Mr. Florence would personally try the case." The court noted the rule that employment of a member of a firm is employment of the firm absent a special agreement to the contrary. The court then stated that it "[did not] think there was an express agreement" that Mr. Florence would personally try the case.

In accommodating the conflicting considerations of either allowing time for Hein to obtain counsel of his choice or moving forward with the orderly process of judicial administration, the trial court was called upon to exercise its discretion. We cannot say that the discretion it exercised infringed upon Hein's constitutional rights.

We examined the record for fundamental error as required by A.R.S. § 13–4035 and found none. Accordingly, we affirm the judgments of conviction and sentences.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.