717 P.2d 879

**STATE of Arizona, Appellee,**

v.

**Lowell Ray FERGUSON, Appellant.**

**No. 6426.**

Supreme Court of Arizona,
En Banc.

April 14, 1986.

202

Robert K. Corbin, Atty. Gen. by Bruce M. Ferg, Asst. Atty. Gen., Tucson, for appellee.

Lingeman & Bock by Richard C. Bock, Tucson, for appellant.

HAYS, Justice.

Following a jury trial, defendant, Lowell Ray Ferguson, was convicted of one count of first degree murder, A.R.S. § 13–1105. He was sentenced to life without possibility of parole for twenty-five years. A.R.S. § 13–703. Accordingly, this court has jurisdiction pursuant to A.R.S. §§ 13–4031, –4035. We affirm.

On March 28, 1984, 88–CRIME received an anonymous phone call advising them that the body of an elderly woman could be found in a desert wash near Sahuarita Mountain Road. The informant also stated that the woman had been murdered by Ray Ferguson. Acting on this call, Pima County authorities proceeded to the wash and did, in fact, discover a body. The body was later identified as that of Cecil Dotman. An autopsy revealed that the victim had been shot twice, once in the shoulder and once in the head.

After the victim had been identified, a search warrant for her residence was issued. While the warrant was being executed, police detained a man who arrived at the residence driving the victim's car. This person told police that defendant had lent him the victim's car, told him he was going to Las Vegas, and gave him an address in Terre Haute, Indiana, where his mail and disability checks could be forwarded if he did not return to Tucson. As a result of this information, an arrest warrant was issued for defendant and transmitted to the authorities in Indiana.

The next day, police received additional information from the anonymous caller. As a result of this information, police were able to locate a person by the name of Roland Johnson. Johnson told police that in March, 1984, defendant had sought his help in getting defendant's car out of the desert, where it had become stuck in the sand. The area was off Sahuarita Road, near where the victim's body was discovered.

Further investigation also revealed that another man, Chester Sams, had been with the victim and defendant at the time of the killing. Sams subsequently gave two statements in which he implicated defendant in the killing.

On March 30, 1984, defendant was arrested in Terre Haute and taken to the Vigo County Jail. The next afternoon, two Pima County detectives arrived in Terre Haute to talk with defendant. The detectives advised defendant of his rights and of the charges against him. After initially denying the charges, defendant later gave a detailed two-hour statement in which he confessed to having killed the victim.

In his statement, defendant related the following events. Since summer, 1983, defendant and the victim, a 75-year-old widow, lived together in a trailer on the victim's property (the title to this property was later transferred to defendant). Chester Sams lived in another trailer located on the same property. On the day of the murder, defendant and Sams had been drinking quite heavily. That evening, after more drinking, Sams, defendant, and the victim drove out towards Ryan Field to get some dinner. After some time, Sams pulled the car off the road so the two men could relieve themselves. Defendant, who had threatened the victim many times in the past and admittedly had a violent tem-

per when he drank, had been arguing with the victim during the ride. When Sams stopped the car, defendant pulled out his .45-caliber gun, which he regularly carried, and ordered the victim out of the car. The victim laughed at defendant, who then shot her twice. The body was returned to the car and the two men drove to the area off Sahuarita Road where Sams then buried the body. When defendant got the car stuck in the sand, Sams hitchhiked home. Defendant remained in the vehicle overnight.

During the trial, defendant testified that he recalled making the statement to the Pima County detectives. However, when asked if it was possible that he shot the victim, defendant responded that "he couldn't say if he was guilty or not." He claimed that he spent most of the day consuming large amounts of beer and that his last recollection of what happened that evening was leaving the trailer with Sams and the victim to get some dinner. The next thing he remembered was waking up the following morning in his car on Sahuarita Road. Defendant further testified that when the victim did not return home for two weeks, he contacted Sams, and the two went to Las Vegas for three days. He stated that since the victim was still not home when he returned, he went to Terre Haute to visit some friends.

In addition to defendant's confession, other evidence was presented at trial. Specifically, there was evidence of flight; evidence that defendant gave a large amount of the victim's clothing to an old girlfriend; evidence that within a few days of the shooting, defendant attempted to sell the .45-caliber pistol he admitted to using on the victim; and evidence that he had burned some checks of the victim at a friend's home shortly after the shooting. There was also evidence that defendant admitted to a friend that he was destroying the victim's possessions to cover up, and that he had received anonymous phone calls asking for "hush" money, to keep the person from calling the police. Defendant's primary defense was that he was an alcoholic and was so drunk at the time of the murder that he had no idea what had happened.

Defendant raises several issues on appeal.

## I.  COMPULSORY PROCESS CLAUSE

■ Defendant maintains that the trial court erred in denying his motion to dismiss for failure to produce a material witness. Specifically, he claims that negligence on the part of the state in releasing Chester Sams from custody deprived him of his constitutional right to compel witnesses in his favor.

Sheriff's detectives questioned Sams concerning the events surrounding the victim's death. In these statements, Sams implicated defendant in the murder. Additionally, he admitted helping defendant dispose of the victim's body and to revisiting the scene of the murder and removing evidence which would have aided in identifying the body. Following these statements, Sams was placed under arrest and charged with one count of first degree murder. He was booked into the Pima County Jail on March 30, 1984.

On the same day, defendant was arrested in Terre Haute, Indiana. He was escorted back to Tucson by Pima County detectives. On April 10, 1984, he was indicted for first degree murder. Following defendant's indictment, the Pima County Attorney's Office dismissed the complaint against Sams and released him from custody.

Later that same afternoon, the sheriff's office received additional evidence linking Sams to the victim's murder. Based on this information, the charge of first degree murder was reinstated against Sams and an additional charge of conspiracy to commit first degree murder was added to the indictment. Although the sheriff's office actively searched for Sams, he was not apprehended until midway through defendant's trial.

Prior to trial, defendant filed a motion to dismiss based on the state's failure to produce Sams, a material witness. After hear-

ing testimony, the trial court denied the motion.

It is well-established that a defendant's right to obtain the testimony of witnesses and compel their attendance is a fundamental element of due process guaranteed by the sixth amendment. *Washington v. Texas*, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). The Ninth Circuit has interpreted this right to compulsory process to include the defendant's right to "formulate his defense uninhibited by government conduct that, in effect, prevents him from interviewing witnesses who may be involved and from determining whether he will subpoena and call them in his defense." *United States v. Tsutagawa*, 500 F.2d 420, 423 (9th Cir.1974). It is clear, however, that the government is under no obligation to look for, or produce, witnesses for the defense, "in the absence of a showing that such witnesses were made unavailable through the suggestion, procurement, or negligence of the [government]." *Ferrari v. United States*, 244 F.2d 132, 141 (9th Cir.), *cert. denied*, 355 U.S. 873, 78 S.Ct. 125, 2 L.Ed.2d 78 (1957); *see also State v. Axley*, 132 Ariz. 383, 388, 646 P.2d 268, 273 (1982).

In the instant case, defendant urges that the state was negligent in releasing Sams from custody when there was evidence that once freed, Sams "would pursue a course of conduct designed to disguise his whereabouts." After reviewing the record, however, we find no negligence on the part of the state. The lead detective in the case testified that the charges against Sams were dismissed, not in an effort to have him leave the jurisdiction so he would be unavailable as a defense witness, but because, after reviewing the case, the county attorney felt it was necessary to verify the information that they had and to determine what additional information they could uncover to bolster that which was received from the 88–CRIME informant and other witnesses. Additionally, another detective testified that Sams was cooperative throughout the investigation and that there was no reason to believe he would leave the jurisdiction. The trial court agreed, find-

ing no evidence that the state impeded defendant's ability to present a fair defense.

We find nothing in the record to indicate that the trial court's findings were in error. The sheriff's inability to locate Sams before trial was not the result of the state's "suggestion, procurement, or negligence." Moreover, once Sams was arrested, even though during the trial, he became available to defense counsel for questioning. Thus, defendant's claim that his constitutional rights were violated fails.

## II. MOTION TO SUPPRESS

Defendant raises several issues concering the admissibility of various statements he made to the police.

### A. *Invocation of Right to Silence*

█ Defendant urges that his confession to Pima County detectives at the Vigo County Jail should have been suppressed as being in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Specifically, he claims that the statement was taken after he had already invoked his right to remain silent.

On March 30, 1984, at approximately 3:15 p.m., a car in which defendant was a passenger was stopped in Terre Haute. According to police officers, defendant had a strong odor of alcohol about him and stumbled as he walked. One officer testified that "his clothes were in disarray. I believe his jeans were dirty, and he had defecated and urinated in his trousers."

Defendant was arrested and taken to police headquarters. Once there, he required the assistance of an officer to help him out of the car. Furthermore, it took two officers to aid him in walking downstairs to the patrol sergeant's office.

While in the office, the shift sergeant attempted to read defendant his *Miranda* rights from an advice of rights form used by the police department. Defendant was given a similar form and told to follow along while the sergeant read it aloud. As the sergeant read from the form, defend-

ant appeared to fall asleep several times. He was awakened each time but would sway back and forth in his chair and appeared still to be intoxicated.

Before the sergeant could finish reading the rights form, defendant stated that he did not want to speak to the officers. Instead, he wanted to speak to the detectives. The other officer present in the room testified that "he [defendant] said he did not want to talk to us, meaning myself and Sergeant Bush, and that is all that was said." The sergeant proceeded to finish reading defendant his rights. When he concluded, the sergeant wrote "Refused" on the waiver portion of the form because, in his opinion, defendant was incapable of understanding what was happening or the rights which were being read to him. Defendant was then transported to the county jail.

The next morning, at approximately 9:30, a detective with the Terre Haute police department went to the county jail and brought defendant back to the police station. At that time, defendant was reread his rights from the department's advice of rights form. He was again given a separate form to read simultaneously. When the detective was finished, defendant signed a waiver of rights form. Later that same afternoon, detectives from the Pima County Sheriff's Department met with defendant at the Terre Haute police station. It was at that time that defendant confessed to the murder.

It is defendant's position that he had effectively asserted his right to remain silent when he was initially read his rights. He claims that the subsequent contact by the Terre Haute detective and the later interrogation by Pima County detectives undermined defendant's prior decision not to answer questions. We do not agree.

Generally, when an accused invokes his right to silence, any custodial interrogation must cease. *Miranda v. Arizona, supra; State v. Finehout,* 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983). The accused may not be requestioned concerning that subject or any related subjects. *State v. Allen,* 140

Ariz. 412, 415, 682 P.2d 417, 420 (1984). In the instant case, two officers from the Terre Haute police department testified that defendant was so intoxicated that he was unable to comprehend the constitutional rights being read to him. Defendant himself had little or no recollection of this initial meeting whatsoever. Under such facts, we do not believe that the act of rereading defendant his rights the next morning was a prohibited resumption of questioning under *Miranda* and its progeny. Instead, it was a salutary attempt by the authorities to insure that defendant was apprised of his rights at a time he could understand them. Such a procedure, designed to assure defendant of his constitutional rights, cannot be a violation of those same rights. The subsequent questioning was simply the result of defendant's waiver of his rights after he understood them. Accordingly, we find no error in the procedure followed by the Terre Haute police.

### B. *Voluntariness*

Next, defendant argues that the trial judge erred in ruling defendant's confession was voluntarily given. Thus, he claims, it should have been suppressed.

Following the murder, defendant and Sams drove to Las Vegas. Defendant testified that during the trip, Sams repeatedly told him, in detail, how he (defendant) had killed the victim. Defendant, however, further claimed that he had no recollection of what really occurred. When questioned as to why he had told Pima County detectives that he did, in fact, murder the victim, defendant responded that the detectives "more or less led me into it and I went along with them."

In Arizona, questions of voluntariness are for the trial court's determination. *State v. Hall,* 120 Ariz. 454, 457, 586 P.2d 1266, 1269 (1978). We will not disturb this finding absent clear and manifest error. *State v. Hein,* 138 Ariz. 360, 365, 674 P.2d 1358, 1363 (1983).

■ Defendant primarily bases his argument on two portions of the confession. The first occurs near the beginning of the statement, shortly after defendant initially denied shooting the victim:

[DETECTIVE]: Let me explain something to you. It's very, very important, as Detective Dhaemers told you, Chester [Sams] is already in jail. And he has already confessed. Okay? If you want to sit here and lie, it's fine with us. Okay? In fact, that makes it easier for us. Because then it'd make Chester look perfect, and you look like a dirty dog. So, if you want to just sit here and lie, we can, we can go ahead and do that. Okay? And I know that you would like to change the story.

At this time, Pima County authorities did, in fact, have Sams in custody. Further, Sams had already given detectives two statements implicating defendant in the victim's murder. We find nothing improper where, as here, officers accurately inform a defendant, from whom they are taking a statement, that he has been implicated in the crime by another. *See State v. Smith*, 138 Ariz. 79, 82, 673 P.2d 17, 20 (1983), *cert. denied*, 465 U.S. 1074, 104 S.Ct. 1429, 79 L.Ed.2d 753 (1984). Moreover, we find neither the circumstances surrounding the statement, nor the officer's manner, inherently coercive. Accordingly, we find no clear and manifest error on this point.

■ The second alleged error stems from an exchange between defendant and Detective Petropolis. This occurs later in the confession:

P. [Y]ou've gotta understand. Alright?
A. Yeah.
P. That, it's all over with. And, I know in your heart, if you could change things, 'cause you're a good man, you'd change them right now. Wouldn't you?
A. Well, I wish we hadn't ah, took off.
P. You're a good Christian man, ain't ya?
A. Yes.
P. And if you could change all this right now, you would. Wouldn't ya?

A. I wish she was still living.
P. I do too. And, I'll tell you something else. It ain't your fault. It's all that drinking and all the other bull shit. It ain't your fault as a human being, is it.
A. No.
P. No. So, it ain't, it ain't Ray's fault. It's all that goddamn alcohol, and all the sins that come with it, ain't it?
A. Yes.
P. That's the truth isn't it?
A. Yes, that's, the alcohol....
P. The alcohol....
A. It's got me tore up, now.
P. Alright alright, see, see, we want to understand. I understand that you as a good man just wouldn't do something like that. Alright? I understand that sometimes a good man just gets dragged down by some things that aren't real good....

Thereafter, Detective Petropolous stated:

P. Look it, partner, it's too late to lie. It's way to [sic] late to lie. I know everything. Absolutely everything. The best thing that you can do, alright, since I know what happened. Detective Dhaemers knows what happened is to say, goddamn, I feel bad. It was a mistake, or otherwise, it's going to look like the most premeditated, cold-blooded crime in the world. It's gonna be one or the other. It's either gonna be it was a mistake or it was a cold-blooded thing. And if you want me to pack my bags up and go and just tell them it was a cold-blooded thing. Fine, I can live with that, but I don't think that's you. And I don't think Gary does either.

I think we're here to give you an opportunity to tell your side of the story. Chet has told us. Chet is under arrest.
....
P. This will make you feel a lot better. A whole lot better. But the only thing that can help you in this position is the truth. Because if we don't get your truth, all we're gonna have to go along

is what Julius and Roland Johnson, Chester Sams, and people at the bars, several live-ins, and all those other people, what they have to say. We don't get what this man is all about. If you want us to go to court, we're just gonna quote facts of other people about you without you. I can do that. But, I don't think you want that. Do you?

A. No.

P. I'll, please don't sit here and tell me you don't remember or it ain't the truth, because, partner, I ... If I just thought you were gonna lie to me, I wouldn't have come all the way over here. Now, the most important question. Alright? This, can we do one question at a time? Did you mean to kill her?

Defendant subsequently confessed to the crime charged.

Defendant claims that the effect of these statements was to tell defendant that if he was guilty, a confession would have a good effect on his sentence; whereas his refusal to confess, if guilty, would have a detrimental effect. Thus, defendant claims the confession was induced by implied promises and the use of improper influence.[1] We do not agree.

At trial, Detective Dhaemers testified that the statements were not an attempt to coerce a confession from defendant. Instead, he stated:

I think far more that it is an interview technique, when you are attempting to get a person who has committed a crime to confess to a particular crime, this is first degree murder, you have to give them some sort of an out where they are able to talk to you. You just can't go up and talk to a person and say, "did you commit a first degree murder" and expect them to say, "oh, yes, I did." You have to give them some kind of an out, some kind of a way to—for them to explain to themselves why they may have committed a murder.

....

I don't think there was an implied promise to ... we had a conversation with a guy who was nervous, he knew what he had done, he knew that we had known what he had done, and he had attempted, first of all, to lie to us, and he knew now that we knew that he had lied to us.

A determination of voluntariness includes the question of whether a promise was made and if so, whether the confession was a result of that promise. *State v. Hall,* 120 Ariz. at 457, 586 P.2d at 1269. To be deemed voluntary, a confession must not have been induced by a direct or implied promise, however slight. *State v. Hensley,* 137 Ariz. 80, 87, 669 P.2d 58, 65 (1983). Here, the trial court found that defendant "knew what he was doing when he gave these statement, and second, that they were voluntary and not as a result of threat or promise." In reaching this conclusion, the trial court had an opportunity to assess the credibility and demeanor of the witnesses. It also had the opportunity to listen to tape recordings of the confession and determine for itself the existence of any coercion. We find nothing in the record to indicate that the trial court erred in its determination that the detectives' statements were not coercive.

In determining the voluntariness of a confession, a trial judge must assess the totality of the circumstances and decide whether the free will of the defendant has been overborne. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973); *State v. Tison,* 129 Ariz. 526, 537, 633 P.2d 335, 346 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). In the present case, all the circumstances surrounding defendant's statement support the trial court's conclusion that it was voluntary. First, defendant had been fully advised of

---

1. Defendant compares the facts of this case to those in *State v. Hall,* 120 Ariz. 476, 586 P.2d 1288 (App.1978), to support his claim of involuntariness. However, in *State v. Hall,* 120 Ariz. 454, 586 P.2d 1266 (1978), this court found the confession to be voluntary and not the result of inducements by the state.

his *Miranda* rights once it was determined that he was sober. Defendant stated that he understood his rights and that he wanted to speak to detectives. Second, although defendant's statement took approximately 90 minutes, it was not continuous. Defendant was given a break and provided coffee and cigarettes. Third, while defendant was confessing, he indicated to the detectives that he was "relaxing" and that it felt good to get the incident off his chest. Finally, defendant stated that the first portion of the statement, in which he denied any involvement or knowledge of the crime, was a lie, and that the latter portion of the statement, in which he confessed, was true and made without threat, duress or promise of reward.

After considering these and other circumstances, we believe the facts do not indicate that the statements were involuntary, but rather that they were the result of defendant's free will. We find that the trial court was correct in ruling that the confessions were admissible at trial.

### C. *Effect of Intoxication on Defendant's Confession*

■ Defendant claims that his state of sobriety at the time of his confession, coupled with the arguments advanced under subsections (A) and (B), should have rendered the statement given to Pima County detectives involuntary. Thus, he claims the trial court erred in failing to suppress it at trial. We do not agree.

Defense counsel is correct when he states that the mere fact of intoxication does not render a statement inadmissible. *State v. Clark*, 102 Ariz. 550, 553, 434 P.2d 636, 639 (1967). For a statement to be inadmissible, it must be shown that the defendant was intoxicated to such an extent that he was unable to comprehend the meaning of his statements. *State v. Arredondo*, 111 Ariz. 141, 145, 526 P.2d 163, 167 (1974). If, after considering the totality of the circumstances, the trial judge determines that defendant was able to "reason, comprehend or resist," so as to make a free and rational choice, the state-

ment may be admitted. *State v. Goff*, 25 Ariz.App. 195, 197, 542 P.2d 33, 35 (1975).

In the instant case, the evidence presented at trial indicated that defendant fully understood his rights. The Terre Haute detective, who read defendant his rights the morning after his arrest, testified that defendant appeared to be sober. The detective further stated that although defendant had an "after odor of alcohol" and exhibited some shakes, he was steady on his feet and did not appear to be intoxicated.

There was also the testimony of the two Pima County detectives who took defendant's statements. Both officers testified that defendant appeared to be alert and coherent; that defendant stated he had been read his rights and understood them; that defendant was able to walk and speak without any trouble; that defendant did not appear to be intoxicated, nor did he smell of alcohol; and that, when asked to, defendant was able to calculate the time difference between Indiana and Arizona.

Finally, there was testimony that, when asked by detectives whether he was sober at the time of the statement, defendant responded "Yeah, I'm pretty well—I don't think I'm going to go ahead and have DT's."

After reviewing this testimony and the circumstances surrounding the interrogation, the trial court found that

[E]ven if he [defendant] has a high blood alcohol for drinking quite a copious amount of beers, that the ordinary person would sober up within that time, and the officers again viewing him, testified, these experts that he was able to walk down the street, climb stairs, do the things that a sober person could do. And he may have had a little residual effect of hand tremor from the ingestion of alcohol, but from reading the contents of those statements, I really think that he *wasn't of such a mental state that he didn't know what he was doing, that he could understand the Miranda warning and be fully apprised of his consti-*

*tutional rights when he gave this statement* (emphasis added).

We find that the trial court was correct in ruling that the defendant's statement was voluntary and not the product of intoxication. There was no violation of defendant's constitutional rights.

### D. *Evidence of an Insanity Defense*

Defendant raises two issues concerning the admissibility of statements made by him to two Pima County detectives. The statements arose from a conversation at the Chicago airport during the return trip to Tucson. Throughout the conversation, defendant repeatedly told sheriff's detectives how he killed the victim and how bad he felt about it. At one point, defendant stated that he was going to plead insanity because "It's the only way out. I have got to try it." Defendant had not been readvised of his *Miranda* rights prior to this conversation.

First, defendant claims that the trial court should have suppressed the conversation. He argues that his failure to receive a new set of *Miranda* warnings was in violation of his right to remain silent. In support of this argument, defendant emphasizes that the airport conversation took place two days after he had been advised of his rights. Defendant attempts to distinguish this situation from those cases which uniformly hold that, once a defendant has been fully and fairly apprised of his rights, further warnings are not required absent a change of circumstances. *See, e.g., State v. Noriega,* 142 Ariz. 474, 480, 690 P.2d 775, 781 (1984); *State v. Miller,* 110 Ariz. 597, 598, 522 P.2d 23, 24, *cert. denied,* 419 U.S. 1004, 95 S.Ct. 325, 42 L.Ed.2d 281 (1974). We need not, however, reach this issue.

At trial, both detectives testified adamantly that defendant initiated the conversation. One detective testified as follows:

Q. Okay. And can you tell us what did—first of all, the very first conversation you had at the airport, who initiated the conversation about the incident?

A. Mr. Ferguson.

Q. Do you remember how he initiated it?

A. Well, he was talking about how he felt in regards to killing Cecil Dotman.

The second detective testified similarly. Defendant, however, did not testify at all concerning the statements.

Generally, if an individual undergoing custodial interrogation indicates that he wishes to remain silent, the interrogation must cease. *Miranda v. Arizona, supra.* Where, however, a statement of any kind is volunteered, it is neither barred by the fifth amendment nor is its admissibility affected by *Miranda. State v. Kroupa,* 16 Ariz.App. 254, 257, 492 P.2d 750, 753 (1972).

The evidence before the trial court was uncontradicted that defendant initiated the conversation and that the statement was purely voluntary. This is not a case where police failed to scrupulously honor defendant's right to cut off questioning under *Miranda. See Michigan v. Mosely,* 423 U.S. 96, 103–04, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975). Rather, this is a case where defendant himself initiated further communication. "*Miranda* does not require the police to force an accused to remain silent or turn a deaf ear toward an accused who insists upon talking." *State v. Hicks,* 133 Ariz. 64, 74, 649 P.2d 267, 277 (1982). Defendant's statements to the detectives were therefore not in violation of his fifth amendment privilege.

Second, defendant urges that even if the trial court properly admitted the conversation, over his *Miranda* objection, it should have excluded the statement concerning insanity as irrelevant and immaterial. This court, however, will not disturb the ruling of a trial judge absent an abuse of discretion. *State v. Allen,* 140 Ariz. at 414, 682 P.2d at 419 (1984).

Relevant evidence is that evidence having a tendency to make the existence of any material fact more probable or less probable. 17A A.R.S. Rules of Evidence, rule 401. All relevant evidence is admissi-

ble except in those cases where its probative value is substantially outweighed by the danger of unfair prejudice. Rules 402 and 403.

In the instant case, a crucial issue was whether the victim's murder had been premeditated. As we stated in *State v. Mincey*, 130 Ariz. 389, 406, 636 P.2d 637, 654 (1981), *cert. denied*, 455 U.S. 1003, 102 S.Ct. 1638, 71 L.Ed.2d 871 (1982):

> We have held as well that "[i]n resolving the issue of premeditation and deliberation the jury is authorized to take into consideration the conduct of the defendant, *both before and after*, as well as at the time of the homicide, and all attending circumstances." (Citations omitted.) (Emphasis added.)

Here, defendant was aware that he had been charged with first degree murder. Despite this knowledge, defendant made the unelicited statement that he was going to plead insanity because "It's the only way out. I have got to try it." We believe this statement indicates a consciousness of guilt and is a fact which the jury may consider as raising an inference that defendant is guilty. Thus, the statement concerning insanity is not irrelevant.

Further, we do not believe that the probative value of the statement was outweighed by any undue prejudice to defendant. At trial, there was overwhelming evidence presented to support the verdict of guilt. In addition to defendant's confession, which included a physical demonstration of how he shot the victim, there was evidence of flight, evidence that defendant rid himself of various pieces of evidence, and evidence placing defendant and his car near the victim's body the morning after the homicide. Thus, we do not believe that the inference of guilt stemming from this one statement constituted undue or unfair prejudice. Because we agree with the trial court's determination of admissibility, we find no error.

### III. IMPEACHMENT BY EVIDENCE OF COURT-MARTIAL

Defendant next claims that the trial court erred in failing to grant a mistrial after the prosecutor, during cross-examination, inquired whether defendant had been court-martialed.

On direct examination, defendant testified that he had been in the armed services for 8 years, that he had been decorated, and that he received a general-honorable discharge in 1956. Then, during cross-examination, the prosecutor asked "now sir, you indicated your history in the military. Isn't it true, sir, that you were court martialed twice—." Defense counsel immediately objected. The objection was sustained and the trial court ordered the question stricken from the record.

At the conclusion of defendant's testimony, defense counsel moved for a mistrial, claiming that the fact defendant had been court-martialed held no probative value under the Rules of Evidence. The prosecutor, however, claimed that, by testifying as he had, defendant "opened the door" for her to cross-examine him on his military record.

■ The first question we must determine is whether the trial court properly disallowed the cross-examination concerning defendant's court-martial convictions. Generally, under Rule 609, Ariz.R.Evid., a witness may be impeached on cross-examination by evidence of a prior conviction if the conviction (1) was punishable by death or imprisonment in excess of one year, or (2) involved dishonesty or false statement, regardless of the punishment. The state argues, however, that as this was a court-martial conviction, it was not an attempt at ordinary impeachment with a prior conviction. We disagree.

This court has dealt with the issue of court-martial convictions on only one prior occasion. In *Midkiff v. State*, 29 Ariz. 523, 243 P. 601, 606 (1926), the defendant offered to prove that a witness had been court-martialed for desertion in order to impeach the witness' testimony. In upholding exclusion of the evidence, this court stated:

> We think the general rule is that, if a witness has been convicted of a crime, it may be shown for the purpose of affect-

ing his credibility,.... Desertion is purely a military offense; it is not a crime under the general law; its character is such as not to involve moral turpitude or to indicate a disposition or trait that would make the witness' testimony questionable.

*Midkiff v. State,* 29 Ariz. at 537, 243 P. at 606. *See also United States v. Tomaiolo,* 249 F.2d 683 (2nd Cir.1957) (impeachment use of defendant's two court-martial convictions for being A.W.O.L. held improper since the military breaches were not inconsistent with anything stated or implied in defendant's testimony and not the type of crime that may be used for impeachment purposes, *i.e.,* felonies or crimes of moral turpitude). Although Rule 609 no longer contains the language "moral turpitude," we still find the purpose and reasoning behind *Midkiff* persuasive. Where a defendant has been court-martialed for a breach of military discipline, and there is no indication that the crime was punishable by death or imprisonment in excess of one year or that it involved dishonesty or false statement, any evidence of impeachment based on the court-martial conviction is inadmissible under Rule 609. Where, however, the court-martial conviction involves a crime that comes within this criteria, it shall be admissible only after the trial court determines that its probative value outweighs its prejudicial effect.

Here, despite her argument that defendant's testimony "opened the door," the prosecutor made no showing that either of defendant's court-martial convictions involved "dishonesty or false statement" or that they would reflect unfavorably on his credibility. Moreover, there is no indication that the crimes for which defendant was court-martialed were "punishable · by death or imprisonment in excess of one year...." Accordingly, we find no error in the trial court's refusal to allow cross-examination of defendant concerning his court-martial convictions.

■ Next, we must determine whether, in light of the foregoing, the trial court erred in not granting defendant a mistrial after the prosecutor referred to defendant's court-martial record. The decision to grant a mistrial is a serious one. *State v. Christensen,* 129 Ariz. 32, 38, 628 P.2d 580, 586 (1981). It is a matter left to the sound discretion of the trial court and, absent an abuse of discretion, its decision will not be disturbed. *Id.* Here, the prosecutor had not even completed her question when defense counsel objected. In sustaining the objection, the trial court instructed the jury to disregard the county attorney's remark and to "put it out of your mind, forget it." Moreover, in ruling on defendant's motion for mistrial, the court stated that although the prosecutor's conduct was improper, he believed it had no undue influence on the jury:

> But I think that the prejudicial effect on it is nil, and it's not going to affect Mr. Ferguson's right to a fair trial.
>
> If I thought it did, I'd declare a mistrial, but I just don't think that the brief mention "you were court-martialed twice" is going to sway that jury in the least in determining what their verdict will be in this case.

As it is difficult for us to determine what effect the prosecutor's question may have had on the jury, we defer to the discretion of the trial judge, who was in the best position to observe the jury and evaluate any possible adverse reaction to the comment. Having found nothing to indicate that the trial court abused this discretion, we find no error in his decision to deny defendant's motion for mistrial.

## IV. JURY INSTRUCTION

■ Defendant maintains that the trial court erred in refusing to give his requested instruction on motive. The specific instruction requested by defendant read:

> The state need not prove motive but motive or lack of motive is a circumstance that may be considered in determining guilt or innocence.

The trial court refused the instruction as argument.

Defendant claims that the failure to give his requested instruction deprived the jury of the opportunity to consider motive in determining whether or not the state proved that the murder was an intentional

act. In support of his position, defendant cites *State v. Hunter*, 136 Ariz. 45, 664 P.2d 195 (1983). In *Hunter*, this court held that a motive instruction, similar to the one at issue, should be given upon proper request. As it appears that such a request was made, the court's failure to give the instruction was error.

We do not believe, however, that in this case the court's failure to instruct the jury on motive denied defendant a fair trial. In *Hunter*, the trial judge instructed the jury that the state was not required to prove motive. The instruction did not, however, inform the jury that motive was a circumstance it could consider in determining guilt or innocence. Because we believed the instruction had the "potential to mislead the jury into thinking that motive or lack of motive is of no significance at all," we held that the instruction was incomplete and should not have been given. *State v. Hunter*, 136 Ariz. at 50, 664 P.2d at 200.

In the instant case, the fear that the jury will be prejudiced or misled by an incomplete instruction is not present. Moreover, the court's refusal to give the instruction did not preclude defense counsel from presenting evidence that defendant had no motive and arguing that he therefore had no reason to commit premeditated murder.[2] Additionally, defendant's theory was amply covered by the court's instructions on first degree murder, including definitions of "premeditation" and "intentional."

Thus, even though we find error in the trial court's refusal to give defendant's requested instruction on motive, we hold that in this case it did not act to deny defendant a fair trial.

## V. PROSECUTORIAL MISCONDUCT

██ Finally, defendant urges that a comment made by the prosecutor during closing argument denied him a fair trial. Thus, he claims, the trial court's refusal to grant a mistrial was an abuse of discretion.

During his case in chief, defendant presented the testimony of Dr. Alfred Kaszniak, a neuropsychologist. Dr. Kaszniak testified primarily to the effects of alcohol on human behavior. With regard to this testimony, the following comment was made during the prosecutor's closing argument:

[COUNTY ATTORNEY] And again, Dr. Kaszniak testified about blackouts and amnesia and all these things which can be present. But you never heard him say that on the day in question this defendant was suffering from that kind—

[DEFENSE COUNSEL] I will object, that is improper argument your honor.

The basis for defendant's objection and subsequent motion for mistrial was that, in Arizona, an expert witness is generally precluded from giving an opinion concerning a defendant's state of mind at the time of the alleged crime. *See, e.g., State v. Christensen*, 129 Ariz. at 35–36, 628 P.2d at 583–84 (1981). Therefore, he claims the prosecutor's statement regarding specific intent was improper. While the trial court sustained defendant's objection, it denied his motion for mistrial. Defendant, however, urges that the comment was so objectionable as to require a mistrial.

This court will reverse a conviction on the basis of prosecutorial misconduct only where the misconduct has denied defendant a fair trial. *State v. Bracy*, 145 Ariz. 520, 526, 703 P.2d 464, 470 (1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986). A defendant is denied a fair trial because of prosecutorial misconduct if there exists a reasonable likelihood that the jury's verdict could have been influenced by the remarks. *Id.* Whether such a likelihood exists is left to the sound discretion of the trial court. *Id.*

In the instant case, we do not believe the trial court abused its discretion in refusing to grant defendant a mistrial. To alleviate any possible prejudice from the comment, the trial court not only sustained defendant's objection, but also instructed the jury

---

2. At trial, defendant introduced the testimony of a witness, Emery Barker, to show that monetary gain could not be a motive for the murder. Barker testified that approximately 7 months before her murder, the victim conveyed the title to her property to defendant.

"to disregard the part about Dr. Kaszniak not giving any opinion." Additionally, the court instructed the jury that arguments by counsel were not evidence to be considered in reaching their verdicts. As we stated earlier, the trial court is in the best position to observe the jury and determine the effect, if any, the impermissible comment may have had.

Based on the corrective action taken by the trial court and the overwhelming evidence presented against defendant at trial, we cannot find that the trial court abused its discretion in denying defendant's motion for mistrial.

We have reviewed the record for fundamental error and have found none. A.R.S. § 13–4035; *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967).

Judgment of conviction and sentence affirmed.

HOLOHAN, C.J., GORDON, V.C.J., and CAMERON and FELDMAN, JJ., concur.