733 P.2d 1090

**STATE of Arizona, Appellee,**

v.

**Aurelio Calderon RIVERA, Appellant.**

**No. 6673.**

Supreme Court of Arizona,
En Banc.

March 4, 1987.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Joseph T. Maziarz, Asst. Attys. Gen., Phoenix, for appellee.

Frederic J. Dardis, Pima County Public Defender by Frank P. Leto, Deputy Pima County Public Defender, Tucson, for appellant.

HOLOHAN, Justice.

Defendant, Aurelio Calderon Rivera, was convicted of one count of first degree murder under A.R.S. § 13–1105 and sentenced to life imprisonment without possibility of parole for 25 years. We have jurisdiction over this appeal pursuant to Ariz. Const. art. 6, § 5(3) and A.R.S. §§ 13–4031, –4035.

Defendant raises six issues for review:

    I.  Did the State's failure to obtain a blood alcohol test from defendant vio-

late defendant's due process right to a fair trial?

II. Did the trial court err by admitting defendant's statement to police?

III. Did the trial court err in precluding expert testimony on defendant's alleged character trait of "panic reaction to stress" and on the effects of voluntary intoxication?

IV. Did the trial court err in admitting allegedly gruesome photographs of the victim and crime scene?

V. Did the trial court err in refusing two of defendant's proffered jury instructions?

VI. Did the trial court err in permitting the State to rebut defendant's assertion that the victim made homosexual advances toward defendant?

Defendant, who had been in the United States for less than three months and spoke no English, was living in South Tucson with Marcello Madrid, a co-worker at a local restaurant. On October 9, 1984, defendant and Madrid went to a bar in Tucson around 4:00 p.m. and drank several pitchers of beer. Madrid left defendant at the bar at about 9:00 p.m.

Defendant stayed at the bar until he was refused service. He then took a 12–pack of beer with him to another bar where he began drinking with the victim and another man. It is unclear how much additional beer the three men consumed before they went to defendant's residence where they continued to drink. According to defendant, after arriving at the house the victim and the unidentified third party accused defendant of being a "fag." Defendant claims that once the third party left, the victim asked defendant if he "would let him do sex." Then the victim exposed himself to defendant and threatened "to screw him by force." Defendant punched the victim and then went outside, picked up a 2 × 4 and returned inside to strike the victim repeatedly with the board. After dragging the body into a detached room which served as his sleeping quarters, defendant returned to the main part of the house to try to clean it up before falling asleep at approximately 4:00 a.m.

Madrid did not return to the residence he shared with defendant until approximately 9:00 a.m. Upon arriving, he found the front door locked and the stereo playing loudly. Looking through the front window, he observed defendant asleep on the couch. Madrid unsuccessfully attempted to arouse defendant by yelling at him, knocking on the window, and then opening the window and tossing several pebbles at him. Finding that the rear door to the house was also locked, Madrid opened the door to the detached room and discovered a body covered with a blanket. He went to a nearby bar, called the police, and returned to the house.

Officer Vizmanos of the South Tucson Police Department, the first officer to arrive, confirmed that the victim was dead. He attempted to arouse defendant by shouting and by knocking on the front door but was unsuccessful. Eventually, after the arrival of three more officers, defendant responded and arose to open the front door.

When the officers identified themselves and asked defendant his name, defendant answered in Spanish. Detective Campa, who is fluent in Spanish, asked defendant what had happened, and defendant started to relate that he had killed a man. Noticing blood on defendant's clothing, Campa advised defendant of his *Miranda* rights. Defendant acknowledged that he understood his rights and indicated that he would answer Campa's questions. Defendant said that some men had attempted to rape him and that he had killed one of them. When Campa asked defendant if he would go to the police station and make a taped statement, defendant agreed.

Before beginning questioning at the station, Campa again spoke in Spanish to defendant. Defendant assured the officer that he understood his rights and then consented to a search of his residence. After receiving defendant's statement, Campa took defendant to a restroom and asked him to remove his blood-splattered pants.

Detective Corkill obtained written consent from co-resident Madrid before supervising the subsequent search of the residence. The detective found the murder weapon on the top shelf of the closet in the detached bedroom.

### I

Defendant asserts that the State violated the rule established in *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to test his blood alcohol content at the time of his arrest. The defendant contends that the State's failure to conduct the test was tantamount to losing or destroying evidence favorable to the defense. Consequently, defendant claims he is entitled to dismissal of the first degree murder charge. In the alternative, defendant asserts that he was entitled to a *Willits* instruction. *See State v. Willits,* 96 Ariz. 184, 393 P.2d 274 (1964).[1]

■ A defendant's due process right to a fair trial is violated when the State either *suppresses* or *destroys* evidence favorable to him and he is prejudiced thereby. *See Brady v. Maryland,* 373 U.S. at 87, 83 S.Ct. at 1196–97, 10 L.Ed.2d at 218; *Scales v. City Court of Mesa,* 122 Ariz. 231, 234, 594 P.2d 97, 100 (1979). We have recently expanded on this rule to find that the State also has a duty "to ensure the *preservation* of evidence it is aware of where that evidence is obviously material and reasonably within its grasp." *State v. Perez,* 141 Ariz. 459, 463, 687 P.2d 1214, 1218 (1984) (emphasis added). The action necessary to cure the State's violation of the defendant's right depends upon the prejudice caused to the defendant. In cases where the State has suppressed evidence and the evidence is still available, the defendant's due process right is protected by granting him a new trial. *See Brady, supra.* In instances where the evidence is no longer available because the State has destroyed the evidence or failed in its duty

to preserve the evidence, the defendant's due process right may nonetheless be protected by the court giving a *Willits* instruction to the jury. *See Perez,* 141 Ariz. at 464, 687 P.2d at 1219. However, if the State has destroyed evidence and the prejudice caused to the defendant is great or the State acted in bad faith or with connivance, the charges against the defendant must be dropped or his conviction reversed; a *Willits* instruction is insufficient to cure the violation of the defendant's due process right. *See Scales,* 122 Ariz. at 234, 594 P.2d at 100; *State v. Hannah,* 120 Ariz. 1, 2, 583 P.2d 888, 889 (1978).

■ We hold that in this case, defendant's due process right to a fair trial has not been violated because the State did not suppress, destroy or fail to preserve evidence. Rather, the State chose not to gather evidence of defendant's blood alcohol level to prove its case.

■ Generally, the State does not have an affirmative duty to seek out and gain possession of potentially exculpatory evidence. *See Montano v. Superior Court,* 149 Ariz. 385, 389, 719 P.2d 271, 275 (1986); *Perez,* 141 Ariz. at 463, 687 P.2d at 1218. We have recently discussed this rule in the limited context of DUI ("driving under the influence") cases. In such cases where specialized blood alcohol tests have been employed by the State, we have required that the police preserve the ampoule or sample of the defendant's breath for testing by the defense. *See, e.g., Scales,* 122 Ariz. at 234, 594 P.2d at 100; *Baca v. Smith,* 124 Ariz. 353, 356, 604 P.2d 617, 620 (1979). Blood alcohol evidence is frequently a dispositive element in the State's proof of a DUI charge because under the DUI statute, a blood alcohol level of 0.10 percent or more raises a presumption that the defendant was under the influence. A.R.S. § 28–692(E)(3). Our rulings in *Scales, Baca* and *Montano* simply provide safeguards for the defendant to insure the

---

1. A *Willits* instruction usually states:
   If you find that the plaintiff, the State of Arizona, has destroyed, caused to be destroyed, or allowed to be destroyed any evidence whose contents or quality are in issue, you may infer that the true fact is against their interest.
   *Willits,* 96 Ariz. at 187, 393 P.2d at 276.

accuracy of the often critical blood alcohol evidence offered by the State at trial.

■ The State has no corresponding duty, however, to gather blood alcohol evidence for the defense to use in corroborating the defense's *own* evidence. Even in DUI cases we have ruled that the State has no duty to perform an initial blood alcohol test. *Montano,* 149 Ariz. at 387, 719 P.2d at 273 (State has "the power to forgo altogether any alcohol testing of DWI suspects"). Likewise, the State has no duty to perform an initial blood alcohol test in a murder case. Evidence of a defendant's blood alcohol level is not used by the State to prove a murder case because intoxication is not an element of the crime of first degree murder. Evidence of intoxication may be introduced by a defendant to try to convince the jury that he lacked the necessary culpable mental state. *See* A.R.S. § 13–503.[2] In the instant case, the trial court properly instructed the jury on the role that evidence of intoxication played in determining defendant's culpable mental state and the State made no attempt to interfere with defendant's introduction of evidence showing defendant was voluntarily intoxicated at the time of the murder.

At most, a blood alcohol test would have corroborated evidence submitted by the *defense* and uncontested by the State that defendant was voluntarily intoxicated at the time of the murder.[3] It is true that there are formulas that can be used to extrapolate a person's blood alcohol level at some point in time prior to the time when the blood alcohol test was performed. In this case, however, the time of the murder is uncertain and it is unknown whether defendant consumed additional alcohol after killing the victim. Consequently, a blood alcohol test would not have added any degree of accuracy to a determination of defendant's level of intoxication at the time of the killing.

We hold that the State's failure to obtain a blood alcohol test from defendant did not deny him a fair trial. We reiterate that the State has no duty to gather evidence for the accused to use in proving his defense. The duties we have imposed on the State in DUI cases apply only to the limited facts of those cases where evidence of intoxication in the form of a blood alcohol test is often dispositive of guilt. Only under such circumstances do we require that the State provide a defendant with the means of testing that critical evidence submitted by the State.

## II

Defendant next asserts that his confession was obtained in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was involuntary. Voluntariness and *Miranda* violations are two separate inquiries. *State v. Montes,* 136 Ariz. 491, 494, 667 P.2d 191, 194 (1983).

### A.  *Miranda Warnings*

■ The necessity of giving *Miranda* warnings relates to the admissibility of a confession and not to its voluntariness. *Montes,* 136 Ariz. at 494, 667 P.2d at 194. A suspect may make a voluntary statement that will nonetheless be inadmissible at trial because law enforcement officers did not

---

**2.** A.R.S. § 13–503 provides:

No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but when the actual existence of the culpable mental state of intentionally or with the intent to is a necessary element to constitute any particular species or degree of offense, the jury may take into consideration the fact that the accused was intoxicated at the time in determining the culpable mental state with which he committed the act.

**3.** Testimony at trial showed defendant had started drinking around 4:00 p.m. on the eve of the murder, had shared two to three pitchers of beer with a friend, and had drunk wine and tequila before the bar refused to serve him anymore. Defendant left the bar after buying a 12–pack of beer to take with him. He continued to drink at a second bar and later at his home. The morning after the murder, the police officers had to awaken defendant from a deep sleep. Furthermore, one officer testified that he detected a "moderate odor" of alcohol on defendant that morning and that defendant's eyes were glazed.

advise the suspect in custody of his *Miranda* rights before questioning him. *Id.* To satisfy *Miranda,* the State must show that defendant understood his rights and intelligently and knowingly relinquished those rights before any custodial interrogation began. *See id.* at 495, 667 P.2d at 195. We have stated that this determination should focus on the particular facts and circumstances of a case, "including the defendant's background, experience and conduct." *Id.*

In *Montes* we ruled that the defendant knowingly and intelligently waived his right to remain silent. The defendant was a Mexican national with little command of the English language and only a· third-grade education, but the detective who spoke to the defendant was fluent in Spanish, gave the defendant his *Miranda* rights in Spanish, and conducted the interview in Spanish. The defendant freely answered the detective's questions and never asked for counsel or attempted to terminate the questioning. *Id.* at 495–96, 667 P.2d at 195–96.

The facts in the present case are similar to those in *Montes.* Here, defendant is also a Mexican national with limited education and no knowledge of English. The detective read him his *Miranda* rights in Spanish and conducted the interview in Spanish. Furthermore, although the reading of defendant's *Miranda* rights was not tape-recorded and the Spanish version of the officer's *Miranda* card was not entered into evidence, the translation of the tape recording of the interview conducted in Spanish at the police station was entered into evidence and indicates that defendant said he understood and waived his *Miranda* rights. Despite the fact that unlike the defendant in *Montes;* defendant here had no prior criminal record in the United States that would have made him familiar with our criminal process, under the totality of the circumstances we do not find that sufficient to negate defendant's waiver of his rights.

**B.  *Voluntariness***

▇▇ "Confessions are prima facie involuntary and the state must show by a preponderance of the evidence that the confession was freely and voluntarily made." *Montes,* 136 Ariz. at 496, 667 P.2d at 196. A confession is not proven voluntary merely because the suspect has been advised of his *Miranda* rights; courts must consider the totality of the circumstances to determine whether the suspect's will was overborne. *See generally State v. Tison,* 129 Ariz. 526, 537, 633 P.2d 335, 346 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982). We will not disturb a trial court's determination of voluntariness absent clear and manifest error. *Montes,* 136 Ariz. at 496, 667 P.2d at 196. "A confession will be found involuntary where the court, considering all the circumstances, determines that one of the following factors exists: (1) impermissible conduct by police, (2) coercive pressures not dispelled, or (3) confession derived directly from prior involuntary statement." *State v. Gretzler,* 126 Ariz. 60, 82, 612 P.2d 1023, 1045 (1980).

In the present case there is no evidence that defendant was coerced or abused in any way. Defendant argues that he was susceptible to the questioning of the police because he knew that in Mexico the police "obligate" suspects to confess without recognizing any right to silence or right to counsel. This argument is without merit. The record contains no evidence that the Arizona police did anything to suggest to defendant that they would deny him any of the rights available to him in the United States of which they had properly informed him earlier.

▇▇ The fact that defendant may still have been intoxicated at the time of his confession does not necessarily make the statement involuntary and thus inadmissible; the court must consider once again the totality of the circumstances. *See State v. Hicks,* 133 Ariz. 64, 72, 649 P.2d 267, 275 (1982) (confession made by defendant with .26 percent blood alcohol level ruled voluntary). It is a denial of due process to admit into evidence an incriminatory state-

ment that is involuntary because of extreme intoxication. *Id.* However, the confession is inadmissible only if it is shown "that the accused was intoxicated to such an extent that he was unable to understand the meaning of his comments." *Id.; see also State v. Ferguson,* 149 Ariz. 200, 208–09, 717 P.2d 879, 887–88 (1986).

The detective who questioned defendant testified that although defendant smelled of alcohol, he appeared to be walking normally, his speech was not slurred, and he was coherent and able to talk. Considering the totality of the circumstances, the trial court did not err in ruling that defendant was not intoxicated to such a degree as to make his statement inadmissible.

We affirm the trial court's finding that the police properly read defendant his *Miranda* rights, defendant understood those rights, and intelligently and knowingly waived them. Furthermore, defendant's subsequent confession was voluntary.

### III

Defendant challenges the trial court's rulings precluding him from presenting expert testimony on: (1) defendant's alleged trait of "panic reaction to stress" exhibited at the time of the killing; (2) the effects of voluntary intoxication on defendant; and (3) the effects of voluntary intoxication on the victim.

### A. *Panic Reaction to Stress*

■ Although personality traits may be established by expert opinion, we have held that the use of expert testimony to establish the trait of acting without reflection (e.g., panic reaction to stress) is limited. *State v. Christensen,* 129 Ariz. 32, 628 P.2d 580 (1981). In *Christensen* we ruled that "[a]n expert witness may not testify specifically as to whether a defendant was or was not acting reflectively *at the time of a killing.*" *Id.* at 35–36, 628 P.2d at 583–84 (emphasis added). Instead, an expert witness can only testify as to the

general tendency of the defendant to act without reflection, allowing the jury to determine the defendant's intent at the time of the alleged crime. *See State v. Hallman,* 137 Ariz. 31, 35, 668 P.2d 874, 878 (1983); *State v. Christensen,* 129 Ariz. at 35–36, 628 P.2d at 583–84;[4] *State v. Dickey,* 125 Ariz. 163, 169, 608 P.2d 302, 307–08 (1980).

We have examined the expert testimony offered by the defense. It reveals only testimony of the defendant's probable state of mind at the time of the offense instead of testimony as to a general personality trait of the defendant. When the trial court excluded the expert testimony, the defense attempted to conform to the law by offering to call the witness to testify generally as to how alcohol affects the thinking processes. However, such testimony still would not have been indicative of a general trait of the defendant. The trial court properly excluded the proffered expert testimony that would have claimed defendant acted reflexively (e.g., "panic reaction to stress") rather than reflectively at the time of the killing.

### B. *Defendant's Intoxication*

■ On the question of whether the trial court properly excluded expert testimony concerning the effect of intoxication on defendant's state of mind at the time of the crime, our decision in *Hicks* is directly on point. In *Hicks* we reiterated that because the effect of alcohol intoxication is a subject matter within the common knowledge and experience of the jury, the trial court properly can preclude expert testimony "relating to the effect of alcohol upon the ability to form specific intent." *Hicks,* 133 Ariz. at 71, 649 P.2d at 274. Similarly, the trial court can deny admission of expert testimony on the issue of alcoholic blackouts as it relates to specific intent. *Id.* Since in the present case defendant offered expert testimony on the effect of intoxication to negate the elements of intent and

---

**4.** In *Christensen* we stated that "[t]he establishment of the character trait of acting without reflection tends to establish that appellant acted

impulsively. From such a fact, the jury could have concluded that he did not premeditate the homicide." 129 Ariz. at 35, 628 P.2d at 583.

premeditation, the trial court properly excluded the testimony.

### C. *Victim's Intoxication*

■ Defendant asserts that expert testimony was necessary to rebut the State's contentions that the victim was a "normal heterosexual" and that normal heterosexuals do not rape individuals of the same sex. Defendant claims the expert testimony was proffered to establish that alcohol intoxication "reduces sexual inhibitions and increases aggressiveness so that there is no connection between 'normal sexuality' and attempted homosexual rape." Appellant's Opening Brief at 47.

This issue is no different than the issue of exclusion of expert testimony regarding the effects of defendant's intoxication discussed above. Once again, we agree with the reasoning of the trial court that the effects of voluntary intoxication are within the common knowledge and experience of the jurors. The trial court correctly ruled that the testimony was inadmissible.

### IV

■ Defendant contends that the admission of gruesome photographs constituted reversible error. Of the photographs that were admitted, four contained views of the victim's body and the rest were views of the crime scene. The photographs depicting the disarray after the murder were neither particularly gruesome nor inflammatory.

Of the four photographs of the victim that the trial court admitted, however, two are arguably gruesome. Exhibit # 1 is a full-length photograph of the victim's body viewed from a distance of approximately 10 feet. The battered face of the victim is represented by less than 1 square inch in the photograph, and although it graphically depicts the victim and may be repulsive, the picture is not inflammatory.

■ The State conceded that Exhibit # 3 is somewhat gruesome. It is an 8″ × 10″ color photograph showing a close-up view of the victim's face after it had been battered by eight blows with a 2 × 4. There is little recognizable as the face of a human being. We find the picture repulsive and inflammatory. Nevertheless, inflammatory photographs may be admitted if they are relevant and if their probative value outweighs the danger of unfair prejudice. *State v. Bracy*, 145 Ariz. 520, 533, 703 P.2d 464, 477 (1985), *cert. denied*, — U.S. ——, 106 S.Ct. 898, 88 L.Ed.2d 932 (1986); *State v. McCall*, 139 Ariz. 147, 157, 677 P.2d 920, 930 (1983), *cert. denied*, 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). We will not second guess the reasoning of the trial court absent a clear abuse of discretion. *Id.* The trial court must look to the purpose of the offer of the exhibit into evidence in making its decision. *Bracy*, 145 Ariz. at 533, 703 P.2d at 477. Two of the reasons for which a trial court may admit photographs are to help determine the degree or atrociousness of the crime, and to corroborate the State's theory of how and why the murder was committed. *Id.* The photographs must tend to prove or disprove a contested issue, otherwise they are merely inflammatory and are not admissible. *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983).

Since defendant was charged with first degree murder, the issues of premeditation and intent were contested. By depicting the result of repeated blows, the photograph served to negate defendant's claim that he was too intoxicated to have intended the murder. Furthermore, since defendant claimed that he was acting to defend himself from sexual assault, the amount of force necessary to repel an assault was at issue. *See* A.R.S. §§ 13–403, –411. The trial court found that because the photograph graphically depicted the amount of force employed, it would assist the jury in determining whether the amount of force defendant used was necessary to prevent the attack. The trial court did not abuse its discretion in admitting Exhibit # 3 or any of the other photographs.

### V

■ Defendant next argues that the trial court committed reversible error when it

refused two of his proffered jury instructions.

### A. *Defendant's Requested Instruction No. 31*

Defendant's requested instruction No. 31 read:

I will instruct you that if there was .10% or more by weight of alcohol in the decedent's blood, then you may presume that the decedent was under the influence of intoxicating liquor.

To preserve an objection to a jury instruction, counsel must state "distinctly the matter to which he objects and the grounds of his objection." R.Crim.P. 21.3, 17 A.R.S.; *State v. Toney*, 113 Ariz. 404, 408, 555 P.2d 650, 654 (1976) (appellant waived his objection to the court's refusal to give his requested instruction by failing to state specific grounds). "A specific objection, timely made, allows the trial judge to consider the propriety of the instruction and cure any error therein before [the instruction is] read to the jury." *State v. Edgar*, 126 Ariz. 206, 209, 613 P.2d 1262, 1265 (1980).

We believe the defense acquiesced in the trial court's denial as evidenced by the following exchange:

MR. CAMPOY [Defense Attorney]: What was the Court going to do on our instruction number thirty-one?

THE COURT: Refused it. I think that's—I don't know that it's been expanded to anything other than operation of a motor vehicle; has it?

MR. CAMPOY: No. But I think the Court said at the beginning of the case in its ruling on the experts that it was going to, you know, we were going to be entitled to an instruction as to what the statutory presumptions were for intoxication.

THE COURT: Point one. Well, you covered that with—who was it you questioned so much? Was it Doctor Henry?

MRS. JORGENSON [Prosecutor]: Doctor Henry.

THE COURT: You can cover what Doctor Henry said, that a person with a point one would be presumed to be under the influence.

MR. CAMPOY: I think it would be proper to state it in terms of an instruction.

THE COURT: But it's not the law, except as to operating a motor vehicle. It's not a presumption in any other type of offense that I know of.

MR. CAMPOY: Just operating a motor vehicle that I know of.

THE COURT: Yes. That was the reason that you got a jump ahead of the State when you asked Doctor Henry and they didn't object.

MR. CAMPOY: [continues on to discussion on Instruction # 2]

Trial Record at 44–46 (July 22, 1985).

We find no objection or grounds for objection in this discourse, the entire discussion on the instruction. However, failure to distinctly object does not waive instructional defects which rise to fundamental error. *Edgar*, 126 Ariz. at 209, 613 P.2d at 1265; *cf. State v. Gillies*, 135 Ariz. 500, 662 P.2d 1007 (1983) (failure to instruct on intoxication was not fundamental error). We hold that it was not fundamental error to refuse the proffered instruction; defendant was not prejudiced by its absence.[5]

Thus, as defendant has waived any error as to requested jury instruction No. 31 and the trial court's failure to give the instruction was not fundamental error, we need not reach the question defendant has raised whether the statutory presumption of intoxication at .10% applies solely to operation of a motor vehicle.

---

**5.** Testimony at trial adequately established that the victim was under the influence of alcohol at the time of his death, and therefore a further jury instruction on the presumption of intoxication was unnecessary. The pathologist who performed the autopsy on the victim testified that the victim had a blood alcohol level of 0.24 at the time of the autopsy which "is a fairly high level.... [I]f you could ingest twelve beers all at once and wait about an hour, it's about how high your [blood] alcohol [level] would be.... Usually at that level, the person's feeling some affects [sic] of the alcohol." Trial Record at 47 (July 19, 1985).

 

B. *Defendant's Requested Instruction No. 16*

 Defendant's requested instruction No. 16 read:

The absence of evidence suggesting a motive for the commission of the crime charged is a circumstance in favor of the accused to be given such weight as the jury deems proper.

Although motive is not an element of the crime of murder, its presence or absence is relevant to a determination of guilt or innocence. *State v. Hunter,* 136 Ariz. 45, 50, 664 P.2d 195, 200 (1983).

In *Hunter,* we said that upon request, the court should give an instruction concerning motive that includes two elements: (1) a statement that the State is not required to prove motive and (2) a statement that motive is a circumstance that the jury may consider in determining guilt or innocence. *Id.* The instruction the defendant proffered in *Hunter* contained only the first element above and not the second. Without both elements we ruled that the instruction was incomplete and had the potential to mislead or confuse the jury. Consequently, we held that the incomplete jury instruction was improper and should not have been given. *Id.*

Likewise, we find that an instruction on motive like the one proffered here which contains only the second element articulated in *Hunter* is also improper because of its potential to mislead or confuse the jury. The instruction failed to inform the jury that the state was not required to prove motive and thus was misleading as to the role of motive in a first degree murder trial. The trial court was correct in refusing to give the proffered instruction.

## VI

 Defendant makes one final contention of reversible error: that the trial court erred in allowing the State to rebut defendant's assertion that the victim made homosexual advances toward him. We uphold the action of the trial court.

Defendant claimed that the victim made a homosexual attack and that he killed the victim in self-defense to repel that act of first aggression. The State's rebuttal of this claim consisted of testimony by the deceased's wife and friends that the victim was a "normal heterosexual" and that they were unaware of the victim having any sexual interest in men.

 Defendant's argument that testimony of the victim's heterosexuality is "negative evidence" and therefore inadmissible, is without merit. Negative evidence is "testimony that a fact did not occur, founded on the witness' failure to hear or see a fact which he would supposedly have heard or seen if it had occurred." 2 Wigmore, EVIDENCE § 664, at 907 (Chadbourn rev. 1979). The defendant presumably is arguing that the testimony that the victim had no homosexual tendencies (from which the jury could infer that the victim could not have made the alleged homosexual attack) was negative evidence. Evidence of homosexuality generally has been treated as character evidence. *See, e.g., Cohn v. Papke,* 655 F.2d 191, 193–94 (9th Cir. 1981); *People v. Limas,* 45 Ill.App.3d 643, 649, 4 Ill.Dec. 242, 247, 359 N.E.2d 1194, 1199 (1977). We see no reason why evidence of heterosexuality should not be treated the same. Although we believe that character evidence is not the same as negative evidence, to the extent that similarities between the two may exist in this factual situation, we hold that the evidence of the victim's character submitted by the State was properly admitted. In Arizona we have rejected the rule that negative evidence is *per se* inadmissible. *See Jones v. Pak-Mor Mfg. Co.,* 145 Ariz. 121, 700 P.2d 819 (1985) (absence of prior accidents). Instead the court should analyze the admissibility of the proffered evidence under the rules of evidence. *See id.* at 125, 700 P.2d at 823.

Under the Arizona Rules of Evidence, "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of Arizona or by applicable statutes or

rules." Ariz.R.Evid. 402, 17A A.R.S. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Ariz.R.Evid. 401, 17A A.R.S. Here, evidence of the victim's past known sexual behavior is not conclusive as to present or future behavior. Furthermore, evidence of his sexual nature is irrelevant in proving or disproving whether he would have attempted a *violent* or *aggressive* sexual attack. However, because we recognize that evidence that a person is a confirmed heterosexual may tend to show that it was not probable that he would engage in a homosexual act, we find testimony regarding the victim's alleged heterosexuality to be of some relevance in this case.

Since we find the testimony relevant, the only rule that would then preclude admission of this evidence in this context is the character evidence rule of Ariz.R.Evid. 404(a), 17A A.R.S. Although this rule generally disallows the admission of character evidence to prove that a person acted in conformity therewith on the occasion at issue, there are exceptions to the general preclusion. The accused may offer evidence of a pertinent trait of character of the victim and the prosecution may use character evidence to rebut the accused's contention. Ariz.R.Evid. 404(a)(2). Here, the defendant came within this exception by offering evidence that the victim attempted a *homosexual* attack. The prosecution's testimony rebutting evidence of the victim's alleged homosexual character was in response to the character evidence forwarded by the defense and therefore was also admissible under the 404(a)(2) exception.

We have searched the record for fundamental error. *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967); A.R.S. § 13–4035. Having found none, we affirm defendant's conviction and sentence.

GORDON, C.J., FELDMAN, V.C.J., and CAMERON, J., concur.