764 P.2d 13

**STATE of Arizona, Appellee,**

v.

**Jose Francisco ORTIZ, Appellant.**

**No. CR–87–0278–AP.**

Supreme Court of Arizona,
In Banc.

Nov. 1, 1988.

Robert K. Corbin, Atty. Gen. by William J. Schafer, III and R. Wayne Ford, Asst. Attys. Gen., Phoenix, for appellee.

John M. Antieau, Phoenix, for appellant.

CAMERON, Justice.

## I. JURISDICTION

Defendant, Jose Francisco Ortiz, was convicted by a jury of first degree murder, A.R.S. § 13–1105. Defendant was sentenced to life imprisonment without possibility of release for twenty-five years. A.R.S. § 13–703(A). We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R. S. §§ 13–4031 and 13–4035.

## II. ISSUES

We must answer three questions on appeal:

1. Were defendant's statements to the police obtained in violation of defendant's Miranda rights?
2. Did the trial court err in allowing the prosecution, but not the defense, to present expert testimony about defendant's mental state at the time of the offense?
3. Did the trial court err in its instructions to the jury?

## III. FACTS

Defendant and the victim, Anna Ramirez, had been a couple for the past six years and had lived together for the last three years. During this relationship, they had two children. As a result of unhappy differences, Anna moved out taking the children with her. Approximately three weeks later on 14 February 1986, the defendant went to the factory where Anna worked and tried unsuccessfully to talk to her. On 17 February 1986, defendant returned and confronted Anna in the parking lot. An argument ensued. Defendant fired several shots at Anna wounding her. She managed to crawl under a parked truck, but defendant followed her. He knelt down and after further discussion, fired twice at the victim, killing her.

Defendant's version of what happened, contained in his trial testimony, is as follows:

> We were talking and I said, I want my children to come back, I want you to come back, I want my children back. And then when she saw that I was crying, she didn't care, she didn't care about anything. She knew how to hurt me. She knew that she was hurting me just by taking away my children. She knew that she could hurt me that way.
>
> Then when I was looking down like that is when she let me have it. That's when she slapped me and that's when I pulled out the gun. I went back to the car because I had it in the car. I brought it out and I shot it, but then one of the bullets popped out and I picked it up. And then I was hurting already. I was boiling by then. Then I shot.
>
> Before I shot, one of the bullets had popped out because I didn't know how to handle the gun. I didn't know how to handle it. That's when I shot. Right after I felt the slap on the face, that's when I shot. I don't know why.
>
> So I went back to the car. I went back to the car crying. And then I didn't want to see what had happened, but then I went back over there and I saw her under the car and I said, give me your hand, you see what you made me do?
>
> And then she started insulting me. She said, you get out of here, you son of a bitch, I'm not going to tell you where your children are, I'm not going to tell you anything. And then when she kicked me, that's when I unloaded the pistol [into her].

Of the numerous eye witnesses, none testified that Anna slapped or kicked the defendant. The testimony also indicated that the defendant fired the first shots after Anna had turned away from him and started to run. Anna died from two gunshot wounds, one of which the defendant inflicted after she crawled under the truck. Defendant fled the scene and went to Mexico. Nine months later, defendant returned to Arizona and was arrested. Defendant appeals from a jury verdict and judgment of guilty of first degree murder and a sentence of life imprisonment.

## IV. VIOLATION OF DEFENDANT'S MIRANDA WARNINGS

Neither Officer Martinsen nor any of the others who participated in the custodial

interrogation after defendant's arrest could speak Spanish. Officer Martinsen was aware that defendant's primary language was Spanish, yet never asked defendant whether he wished to have a Spanish-speaking interpreter present. However, the court granted such a request for the trial. The defendant has an IQ of 80 and a vocabulary at the third grade level.

The defendant contends that, although he had some knowledge of English, he did not understand the technical terms that Officer Martinsen used nor did he understand all of the questions that Martinsen asked. In particular, defendant contends he did not understand Officer Martinsen when he attempted to explain what a lawyer was and did.

> To satisfy *Miranda,* the State must show that defendant understood his rights and intelligently and knowingly relinquished those rights before any custodial interrogation began.

*State v. Rivera,* 152 Ariz. 507, 513, 733 P.2d 1090, 1096 (1987). Relevant to that proof are the " 'defendant's background, experience and conduct.' " *Id. (quoting State v. Montes,* 136 Ariz. 491, 495, 667 P.2d 191, 195 (1983)).

We might be persuaded by defendant's allegations were it not for the fact that the police taped defendant's conversation with Officer Martinsen. The trial court used the tape in reaching its decision as to whether or not to suppress the statements. The tape is part of the record in this court and we also listened to it. In addition, the record contains a reporter's transcript of the tape which, as the trial court noted, was an accurate transcript.

The transcript reads in part:

LM [OFFICER MARTINSEN]: I didn't identify myself, I'm Larry Martinsen. Joe, just in the brief couple minutes we were in the room prior to turning on the tape recorder, ah, you indicated number one that you have no objections to this interview being tape recorded, is that right?

JO [DEFENDANT JOSE ORTIZ]: Yes.

LM: O.K. Speak up so that the tape can hear you.

JO: Yes.

LM: And, you also understood that you're under arrest at this time for homicide, for murder?

JO: Yes.

     \*    \*    \*    \*    \*    \*

LM: And you're understanding these words that I'm saying to you?

JO: Yes.

LM: O.K. If at any time you don't understand what I'm asking you, you ask for an explanation, okay?

LM: You have the right to remain silent. Anything you say can be used against you in a court of law. You have the right to the presence of an attorney to assist you prior to questioning and be with you during questioning if you so desire. If you cannot afford an attorney, you have the right to have an attorney appointed for you prior to questioning. Okay, do you understand those rights?

JO: Yes.

LM: Okay, you understand that you don't have to say anything?

LM: Ah, you understand that you can have an attorney present prior to questioning and during questioning if you want one?

JO: No.

LM: You don't understand that? Okay, basically what I'm telling you is that if you want an attorney prior to making a statement one would be appointed for you and be ah, be counseled before the statement and he could be present during the statement. Okay, you understand that now?

JO: Yes.

LM: Okay. And do you understand that if you cannot afford an attorney, an attorney would be appointed for you at no charge?

JO: Yes.

     \*    \*    \*    \*    \*    \*

LM: O.K. How long have you spoke English Joe?

JO: Ah, I've been here about fifteen years.

LM: Okay. Have you spoken English ...

JO: Before?

LM: ... during that time? Fifteen years?

JO: Yes.

LM: Ah, did you speak English prior to that time?

JO: No, it's for work and you know, if you have to go to the store and stuff.

LM: O.K. Have you attended any schools in the United States?

JO: Yes.

LM: Where have you attended schools?

JO: At ah, I went to ah, from third grade to eighth grade at Imes School, you know, you know, (inaudible) in Glendale.

\* \* \* \* \* \*

LM: O.K. Did you go to high school?

JO: One year, Apollo.

LM: And you went to Apollo High School one year.

JO: Right.

LM: O.K. and you, during that time you were able to read and write in English?

JO: Yes.

\* \* \* \* \* \*

LM: (Clears throat). Who is Anna Ramirez?

JO: She used to be my girlfriend.

LM: And when was she your girlfriend?

JO: Huh?

LM: When was she your girlfriend?

JO: Oh, when we in school. High school.

LM: And for how long?

JO: It was gonna be six years.

LM: O.K. Now I understand that you and Anna, in February, were having problems in your relationship?

JO: Yes.

\* \* \* \* \* \*

LM: ... the day the shooting occurred. You went up there. You said it was early in the morning?

JO: Early in the morning.

LM: Okay. Ah, you're driving the LTD?

JO: Yes.

LM: And, from the time that you drive into the parking lot, tell me what happened. Where did you go?

JO: I stopped, you know, she parked her car and the I ... I ... I parked against this, this other car, this other lot, ah ... space. I ... I stopped right there and then I go, how long it's gonna be you don't want to talk me, goes, no I don't want to talk to you. Come on, I wanna, you know, you gotta talk to me. She goes, no. Please, well if you don't want to talk to me then let me know where you are least, you know, I could have a (inaudible) or something, you know, no because, you know, you ... you didn't even give me a reason why and stuff.

\* \* \* \* \* \*

LM: Okay and then you went back to talk to her?

JO: I went back to talk to her and then she didn't ... didn't want to talk and then she goes just tell me where you're at, and she goes, no I'm not gonna tell you and then I go, come on, please, and then, and then I ... I lost my mind and started shooting.

LM: Okay, and that's when you fired shots at her?

JO: Yes.

LM: How many shots did you fire?

JO: About six.

LM: Okay. Did you fire 'em all?

JO: No.

■ After listening to the tape, we are satisfied that not only did the defendant understand what Officer Martinsen said to him, but that he made his statements voluntarily, intelligently and knowingly. We find no error.

## V. EXPERT TESTIMONY ON DEFENDANT'S MENTAL STATE AT THE TIME OF THE OFFENSE

At trial, Dr. Otto Bendheim, psychiatrist, and Dr. Robert Block, psychologist, testified regarding defendant's mental condition. The defendant called both doctors. Dr. Bendheim testified:

BY MR. RAYNAK [defendant's attorney]

Q. Now, based on those character traits, were you able to make a general evaluation on his tolerance for stress, whether it would be higher, lower or the same as an average individual?

A. People with that kind of character makeup are more likely to break down under stress. They have less resistance, less coping capacity.

MR. RAYNAK: No further questions, Your Honor.

THE COURT: Mr. Lynch, do you have any questions for the Doctor?

MR. LYNCH: Just a few, Your Honor.

### CROSS–EXAMINATION

BY MR. LYNCH: [for the State]

Q. This is not an insanity defense case, is it?

A. Well, because this question was asked, you know, whether I found him psychotic, as we call it, or insane, as the law calls it, and I did not find him insane.

Q. So he knew what he was doing when he shot his girlfriend.

A. Yes.

Q. And he knew that it was wrong to shoot her.

A. Yes.

Defense counsel, claiming that the state had "opened the door," sought permission to ask questions concerning other aspects of his mental condition at the time of the offense. He stated:

The State has basically asked about his state of mind on the day of the offense by indicating whether or not he was insane or not insane. I think that the State has effectively opened the door to allow me to have Dr. Bendheim testify as to what this man was feeling on the day of the offense.

The trial court denied defendant's request.

Later Dr. Block testified on cross-examination by the state:

BY MR. LYNCH:

Q. Talking about Mr. Ortiz here, who you examined, based upon what you observed, the character traits that you observed, is it possible for a person such as Mr. Ortiz to be able to premeditate.

MR. RAYNAK: Again I am going to object, Your Honor. I believe it's beyond Christiansen.

THE COURT: I'm going to overrule that. I don't think Christiansen precludes the question of that nature in light of the fact that we first defined the possibility of him being impulsive and then defined what impulsive people can do or what causes them to be impulsive.

Let me do this. Why don't you restate the question?

\* \* \* \* \* \*

BY MR. LYNCH:

Q. Could an impulsive type of person such as Mr. Ortiz be capable of premeditating?

A. Yes.

In cases involving an insanity defense, expert testimony concerning the defendant's state of mind at the time of the crime is admissible. *State v. McMurtrey*, 136 Ariz. 93, 100, 664 P.2d 637, 644, *cert. denied*, 464 U.S. 858, 104 S.Ct. 180, 78 L.Ed. 2d 161 (1983). However, in cases not involving an insanity defense, an expert witness ordinarily may not give an opinion concerning the defendant's state of mind at the time of the crime. *See State v. Christensen*, 129 Ariz. 32, 35–36, 628 P.2d 580, 583–84 (1981). In the instant case, the defendant had withdrawn his insanity defense. Even so, the defendant did not object to testimony by the psychiatrist that defendant knew right from wrong at the time of the crime. Moreover, such testimony was not prejudicial because the law presumes a defendant knows right from wrong at the time of the crime. A.R.S. § 13–502; *see also State v. Berndt*, 138 Ariz. 41, 45, 672 P.2d 1311, 1315 (1983).

Defendant, however, wanted to question the expert witnesses about defendant's probable mental state and particularly his "impulsivity" at the time of the crime. In

*State v. Rivera,* we noted the distinction that is drawn between a person's continuing "general personality trait" (about which expert testimony is admissible) and a person's "probable state of mind at the time of the offense," which is for the jury to determine. *State v. Rivera,* 152 Ariz. 507, 514, 733 P.2d 1090, 1097 (1987).

In *Christensen* we ruled that "[a]n expert witness may not testify specifically as to whether a defendant was or was not acting reflectively *at the time of a killing.*" *Christensen,* 129 Ariz. at 35–36, 628 P.2d at 583–84 (emphasis added). Instead, an expert witness can only testify as to the general tendency of the defendant to act without reflection, allowing the jury to determine the defendant's intent at the time of the alleged crime. *See State v. Hallman,* 137 Ariz. 31, 35, 668 P.2d 874, 878 (1983); *State v. Christensen,* 129 Ariz. at 35–36, 628 P.2d at 583–84; *State v. Dickey,* 125 Ariz. 163, 169, 608 P.2d 302, 307–08 (1980). *Rivera,* 152 Ariz. at 514, 733 P.2d at 1097.

■ In the instant case, the court strictly followed *Christensen* and allowed testimony concerning the defendant's ability to reflect or premeditate generally, but not testimony concerning intent at the time of the crime. We believe that the questions asked Dr. Block concerning defendant's ability to premeditate were permissible because they focused on the defendant's general personality trait rather than his probable mental state at the time of the offense.

We find no error.

## VI. ERROR IN INSTRUCTION

The trial court instructed the jury on:

a. premeditated first degree murder A.R.S. § 13–1105(A)(1),

b. second degree murder A.R.S. § 13–1104(A)(1)–(3),

c. manslaughter (heat of passion) A.R.S. § 13–1103(A)(2).

The trial court denied defendant's request for instructions on:

d. manslaughter (reckless) A.R.S. § 13–1103(A)(1),

e. negligent homicide A.R.S. § 13–1102.

The defendant raises four questions regarding the instructions.

## A. REFLECTION

The trial judge gave the following instruction on first degree murder:

12. The crime of first-degree murder requires proof of the following three things:

1. The defendant caused the death of another person; and

2. The defendant intended or knew that he would cause the death of another person; and

3. The defendant acted with premeditation.

Premeditation means the defendant's intention or knowledge existed before the killing long enough to permit *reflection.* However, the time for *reflection* must be longer than the time merely required to form the intent or knowledge that the conduct would cause death.

An act is not done with premeditation if it is the instant effect of a sudden quarrel or heat of passion. (Emphasis added).

■ After some deliberation, the jury requested a definition of the term "reflection" contained in the instruction. Defendant requested that the judge instruct the jury that "reflection" included "meditation." The trial judge disagreed and instructed the jury as follows:

The definition of "reflection" which would apply here is a thought, idea or opinion formed as a result of deliberation or serious consideration. However, you are cautioned that "reflection" as used in the instruction on first-degree murder means a mental process which is longer and more serious than merely needed to form intention.

We agree with the trial judge. At the trial, the judge indicated the inclusion of "meditation" in the definition would have erroneously conveyed to the jury that reflection require "some long and deep meditating thought." This is inconsistent with the element of first degree murder that

only requires premeditation. We find no error.

## B. SECOND DEGREE MURDER

The court's instruction as to second degree murder stated:

13. The difference between first-degree murder and second-degree murder is that second-degree murder does not require premeditation by the defendant. The crime of second-degree murder requires that the defendant intentionally killed another person or the defendant caused the death of another person by conduct which he knew would cause the death or serious physical injury, or under circumstances which plainly show an extreme indifference to human life, the defendant caused the death of another person by consciously disregarding a grave risk of death. The risk must be such that disregarding it was a gross deviation from what a reasonable person would have done.

This instruction follows R.A.J.I. (Criminal) 11.04. Defendant contends that the second degree murder instruction was erroneous because it omitted the mental state of "recklessly," which is included in the statute that reads:

A. A person commits second degree murder if without premeditation:

1. Such person intentionally causes the death of another person; *or*

2. Knowing that his conduct will cause death or serious physical injury, such person causes the death of another person; *or*

3. Under circumstances manifesting extreme indifference to human life, such person *recklessly* engages in conduct which creates a grave risk of death and thereby causes the death of another person.

A.R.S. § 13–1104(A)(1)–(3) (emphasis added).

■ A party is entitled to any instruction reasonably supported by the evidence. *State v. Shumway,* 137 Ariz. 585, 588, 672 P.2d 929, 932 (1983). In the instant case, the evidence supported a second degree murder instruction. There was, however, no evidence that this was a reckless shooting. The trial court was correct when it concluded: "[T]here is no way in the world that reasonable people could come to the conclusion that it is the result of recklessness." We agree. There was nothing in the evidence that would support an instruction of "recklessly." It would have been erroneous to give such an instruction.

We find no error.

## C. MANSLAUGHTER

The court instructed the jury on the lesser-included offense of manslaughter, A.R.S. § 13–1103(A)(2), as follows:

14. A killing which would otherwise be second-degree murder is manslaughter if the defendant acted upon a sudden quarrel or heat of passion resulting from adequate provocation by the person killed. The crime of manslaughter requires proof of the following three things:

1. The defendant intentionally killed another person or the defendant caused the death of another person by conduct which he knew would cause death or serious physical injury, or under circumstances which plainly show an extreme indifference to human life, the defendant caused the death of another person by consciously disregarding a grave risk of death. The risk must be such that disregarding it was a gross deviation from what a reasonable person in the defendant's situation would have done; and

2. The defendant acted upon a sudden quarrel or heat of passion; and

3. The sudden quarrel or heat of passion resulted from adequate provocation by the person who was killed.

Adequate provocation means conduct or circumstances sufficient to deprive a reasonable person of self-control. Words alone are not adequate provocation to justify reducing an intentional killing to manslaughter.

There must not have been a cooling-off period between the provocation and the killing. A cooling-off period is the time it would take a reasonable person to re-

gain self-control under the circumstances.

Defendant contends that there was no evidence of a "cooling-off" period. Defendant ignores the fact that he testified that Anna had slapped him, and that he then went back to his car to get the gun. There was also time for a cooling-off between the time the defendant fired the first and the second sets of shots. After Anna sought safety under the pickup, defendant testified that he tried to take her hand before she started "insulting" him. All of these facts support an instruction on the "cooling-off" period.

We find no error.

## D. RECKLESS MANSLAUGHTER

Defendant contends it was error not to include an instruction on reckless manslaughter. We disagree. Defendant's testimony indicated that the murder was anything but reckless. He stated, "she slapped me ... I went back to the car because I had [the gun] in the car. I brought it out and I shot it.... I was boiling by then. Then I shot.... [S]he started insulting me [and] ... she kicked me, that's when I unloaded the pistol [in her]." His conduct was deliberate and not reckless. We find no error.

Even if it had been error, it would have been harmless.

> By convicting a defendant of first degree rather than second degree murder, the jury rejected defendant's claim that his intoxication was such as to lessen his culpability. In other words, by finding defendant guilty of the highest offense, to the exclusion of the immediately lesser-included offense, second degree murder, the jury necessarily rejected all other lesser-included offenses. The error, if indeed it was error, of not instructing as to such offenses was harmless.

*State v. White,* 144 Ariz. 245, 247, 697 P.2d 328, 330 (1985); *see also State v. Nowlin,* 244 N.W.2d 591 (Iowa 1976).

* Gordon, C.J., of the Supreme Court, did not

## VII. RELIEF

We have reviewed the record for fundamental error as required by A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967) and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969). We find no error.

The conviction of first degree murder and the sentence of life imprisonment without possibility of release for twenty-five years are affirmed.

GORDON, C.J., FELDMAN, V.C.J., and HOLOHAN and MOELLER, JJ., concur.