STATE of Minnesota, Respondent,

v.

Andrew Joseph KROSCH, Appellant.

No. C7–01–995.

Supreme Court of Minnesota.

May 2, 2002.

Mary M. McMahon, Special Asst. State Public Defender, McMahon & Associates Criminal Defense, Ltd., Roseville, for Appellant.

Mike A. Hatch, Atty. General, St. Paul, Amy J. Klobuchar, Hennepin Cty. Atty. Linda M. Freyer, Asst. Hennepin Cty. Atty., Minneapolis, for Respondent.

## OPINION

PAGE, Justice.

Andrew Krosch was convicted of first-degree murder in violation of Minn.Stat. § 609.185(1) (2000) for the killing of Andrea Applebee and first-degree felony murder in violation of Minn.Stat. § 609.185(3) for the killing of Daniel Kab-

tyimer. In this direct appeal, Krosch claims that the state deprived him of due process of law by failing to test his alcohol concentration at the time of his arrest and that prejudicial error resulted from the trial court's refusal to instruct the jury that, had an alcohol-concentration test been conducted, it would have produced evidence unfavorable to the state. In his pro se brief, Krosch alleges that trial counsel and the trial court made a number of additional errors. We affirm.

The facts giving rise to Krosch's convictions are straightforward. At approximately 5:30 p.m. on April 6, 2000, Krosch bought a one-liter bottle of vodka and a half-gallon bottle of vodka at a liquor store. Krosch immediately mixed some of the vodka with soda in a soda bottle and consumed an unknown amount of the vodka over the next several hours. At some point during the evening, Krosch went to a bar in a van assigned to him by his employer. Although Krosch did not remember exactly how much alcohol he consumed at the bar, he testified that he probably had his vodka and soda with him and that he probably had a "couple of glasses of beer" there as well. A waitress testified that when she asked Krosch to leave the bar at closing time he "just stood there" and did not leave until approximately 10 minutes later. Krosch re-entered the bar within five minutes through a service door in the kitchen. At that point, another employee asked Krosch to leave and Krosch complied. The waitress testified that Krosch's speech was not slurred and that he did not stumble or engage in aggressive behavior while he was at the bar.

Meanwhile, Andrea Applebee, the only passenger on a Metro Transit bus traveling north on Nicollet Avenue in Minneapolis, Minnesota, got off the bus some time after 2:38 a.m. on April 7, 2000, at the intersection of Franklin Avenue and Nicol-

let. The bus driver testified that he did not observe anyone else in the area.

At approximately 3:00 a.m., Robert Blaisdell saw what was later identified as Applebee's body lying in a pool of blood near the curb on 10th Avenue between 23rd and 24th Streets in Minneapolis. Blaisdell called 911 and the emergency medical services team that responded to the scene determined that Applebee was dead. The autopsy performed on Applebee's body revealed eight gunshot wounds, all to the left side of her head and face. The autopsy also revealed that the barrel of the gun was no further than approximately eight inches from Applebee's skin when the shots were fired and that two of the shots were fired with the barrel of the gun either in contact or almost in contact with her skin.

A videotape recorded by a surveillance camera at the Minneapolis St. Paul International Airport showed Krosch's van in a ramp parked at 3:40 a.m. on April 7. A second videotape recorded by a surveillance camera in the ramp depicted Krosch riding an elevator to the ground level at 4:58 a.m. A police officer who recovered the van from the airport ramp observed that its front passenger window was bloody and broken and that there was blood dripping down the exterior of the van. A later, more thorough examination of the van revealed five bullet casings, two fired bullets, a bullet hole in the interior trim on the front passenger door, a large amount of blood on the floor in the front passenger-seat area, an empty cola can, and a one-liter bottle of vodka that was approximately one-quarter to one-third full.

Airport records indicate that Kabtyimer left the airport driving Blue & White cab number 503 at 6:08 a.m. on April 7. At approximately 6:20 a.m., Susanne Dunn heard a crash outside of her house at 32nd

Street and 20th Avenue in Minneapolis. Dunn went outside and saw that a Blue & White cab had run into a van parked on 32nd Street. Dunn saw a man trying to pull something out of the cab and heard the man say "come on, come on, son of a— come on." Eventually, she saw something fall out of the front door on the driver's side. The man then got into the driver's seat and backed the cab over the object he had pulled from it. At that point, Dunn realized that the object pulled from the cab was a human body. After backing up, the cab headed east on 32nd Street, pushing the body down the street approximately 50 feet. When the police arrived, they found Kabtyimer's body lying on 32nd Street near the alley between 20th and 21st Avenues.

The autopsy performed on Kabtyimer's body indicated that he was shot eight times with a small-caliber weapon from a distance of two feet or less. The autopsy also indicated that Kabtyimer suffered a number of blunt-force injuries to his scalp, face, hands, and buttocks that were consistent with his body having been pushed or dragged along a road. Based on the small amount of blood associated with the blunt-force injuries, the medical examiner concluded that Kabtyimer was probably dead at the time they occurred.

Later in the morning of April 7, a police officer with the Alexandria, Minnesota, Police Department heard a report that a Blue & White cab wanted in connection with a Minneapolis homicide was traveling west on Interstate 94. Soon afterward, the officer observed a Blue & White cab heading west on I 94 and followed it. That officer was eventually joined by two Minnesota State Patrol Troopers. After following the cab for a while, the officers turned on their emergency lights and the driver of the cab—later identified as Krosch—immediately moved to the right shoulder of the highway and stopped. According to their testimony, the officers did not observe any erratic driving behavior, other than speeding, as they followed the cab. One of the officers ordered Krosch to throw the cab's keys out the window. Krosch did not initially follow the order, but after it was repeated a number of times he complied. Krosch also complied with the officers' order to get out of the cab, and the officers testified that Krosch did not stagger, fall, or appear to be unbalanced as he did so. When ordered to turn around, put his hands up, and walk backward toward the officers, Krosch did so, covering "roughly 20, 25 feet" without staggering or showing any other sign of difficulty.

During a search of Krosch's person, the officers found a .22 caliber handgun containing an empty clip and an empty shell in Krosch's right front pants pocket, a loaded clip and a large folding knife in his left front pants pocket, and a loaded clip in his left rear pants pocket.

After conducting the search, one of the officers read Krosch the implied consent advisory provided in Minn.Stat. § 169.123, subd. 2(b) (1998).[1] The officer had smelled alcohol on Krosch's breath and observed a half-gallon bottle of vodka in the cab. The officer testified that he read the advisory because he thought that Krosch killed someone by hitting them with the cab and that "there was a criminal negligence charge going to be coming out of this, and we would want to know what alcohol level is on a charge of that type." Before an alcohol-concentration test could be conducted, however, the officer received word

---

1. Section 169.123, subdivision 2(b), is now codified at Minn.Stat. § 169A.51, subd. 2 (2000).

from the Minneapolis Police Department that an alcohol-concentration test was unnecessary. As a result, none was conducted. The record is silent as to why the Minneapolis police told the officer not to conduct an alcohol-concentration test.

In a tape-recorded conversation with one of the officers after his arrest, Krosch stated that, given his "watermelon size liver," he was probably not under the influence of alcohol. He also stated, however, that there was a bottle of alcohol in the cab and that he had been "drinking little ·sips here and there" as he was driving.

A search of the cab revealed nine shell casings and a bloody duffel bag containing a .45 caliber handgun, a Glock nine-millimeter handgun, and an array of .22 caliber, .45 caliber, and nine-millimeter ammunition. A bottle of cola, a half-gallon bottle of vodka, and a receipt from a gas station [2] were also found in the cab. Blood was found on the underside of the cab.

DNA analysis of the blood samples taken from the van, the .22 caliber handgun Krosch was carrying at the time of his arrest, and his shirt, jeans, duffel bag, and left boot indicated a match with a DNA sample taken from Applebee. A sample of DNA found on Krosch's T-shirt contained a mixture of DNA from Krosch and Applebee. DNA analysis of blood samples recovered from the underside of the cab indicated a match with a DNA sample

taken from Kabtyimer. In addition, a forensic scientist testified that shell casings recovered from Applebee's hair, the van, and the cab were all fired from Krosch's .22 caliber handgun.

Krosch presented a voluntary intoxication defense at trial.[3] Testifying in his own defense, Krosch did not dispute that he killed Applebee and Kabtyimer. He also stated, however, that he did not remember killing them and that he did not intend or plan to kill anyone. Krosch stated that he was unable to recall anything that happened between the time he spoke with a fellow bar patron in Cottage Grove, Minnesota, and the moment at which he was pulled over on I–94. He testified that he thought he was being pulled over for speeding, that he knew he had been drinking in the cab, and that it did not make sense to him when he realized he was driving a cab.

Krosch also testified with respect to his drinking habits, stating that he generally drank between three-fourths of a liter and a liter of alcohol every day. According to Krosch, he often drank while he was working,[4] but was able to perform his job duties without "any troubles." He further testified that he had experienced episodes of forgetfulness in the past and that he would generally forget things whenever he drank more than one-half liter of alcohol.

2. The receipt, dated April 7, 2000, at 6:39 a.m., is for the purchase of 41.071 gallons of gasoline from a gas station in Minneapolis.

3. Minnesota Statutes § 609.075 (2000) provides:
    An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind.

4. Krosch testified that he would typically start work at approximately 8:00 or 9:00 a.m. and would begin to drink sometime between 10:00 a.m. and noon. Krosch stated that he would drink "pretty much" straight through the day until the end of his shift at approximately 4:00 or 5:00 p.m., and that one-half to two-thirds of a liter of alcohol would be gone by then. Krosch would then continue to drink after work until he either passed out or all available alcohol was gone.

Before closing arguments, Krosch's counsel requested a jury instruction providing that the failure of the police to test Krosch's alcohol concentration at the time of his arrest should give rise to an inference that, had the test been conducted, it would have resulted in evidence unfavorable to the state. The trial court refused to give the instruction on the grounds that the arresting officers had testified that Krosch did not appear to be intoxicated at the time of his arrest, that the decision not to administer an alcohol-concentration test was made after the officers learned that Kabtyimer was shot to death, and that there was no legal support for the instruction under the circumstances of the case.

## I.

■ Krosch claims the state deprived him of due process of law by failing to conduct an alcohol-concentration test at the time of his arrest. Specifically, Krosch asserts that the state's failure to conduct the test resulted in a violation of its constitutional duty to preserve potentially exculpatory evidence.

■ A criminal defendant's right to due process of law is implicated when the state loses, destroys, or otherwise fails to preserve material evidence. *See Arizona v. Youngblood*, 488 U.S. 51, 56–58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988); *California v. Trombetta*, 467 U.S. 479, 486–91, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984). The state's duty to preserve evidence exists only with respect to evidence it collects during the investigation of a crime. *State v. Steffes*, 500 N.W.2d 608, 612–13 (N.D. 1993); *State v. Ware*, 118 N.M. 319, 881 P.2d 679, 682 (1994). The reason for this is obvious, as it would be illogical to impose an obligation on the state to preserve evidence that it does not possess.

In support of his claim that the state had a constitutional duty to preserve evi-dence of his alcohol concentration, Krosch argues that the state began to collect the evidence when one of the arresting officers recited the implied consent advisory and that the state's duty to preserve the evidence attached at that time. According to Krosch, the state then lost or destroyed the evidence when it failed to conduct an alcohol-concentration test.

In *State v. Rivera*, 152 Ariz. 507, 733 P.2d 1090 (1987), the Arizona Supreme Court considered an argument essentially identical to the one Krosch makes here. In *Rivera*, the defendant claimed the state deprived him of due process of law by failing to test his blood-alcohol content at the time of his arrest. *Id.* at 1094. Like Krosch, the defendant in *Rivera* presented a voluntary intoxication defense at his trial for first-degree murder. *Id.* at 1095. Also, like Krosch, the defendant contended that the state's failure to conduct a test was tantamount to the loss or destruction of potentially exculpatory evidence. *Id.* at 1094. The Arizona Supreme Court rejected the defendant's attempt to equate the state's failure to conduct a test with a violation of its duty to preserve evidence, reasoning that the state "did not suppress, destroy or fail to preserve evidence. Rather, the State chose not to gather evidence of defendant's blood alcohol level to prove its case." *Id.* We find that the reasoning of the Arizona Supreme Court in *Rivera* is sound.

There is a fundamental distinction between those cases in which the state loses, destroys, or otherwise fails to preserve evidence it has collected and those in which the state fails to collect evidence in the first instance. *Ware*, 881 P.2d at 683; *see Steffes*, 500 N.W.2d at 612–13. As in *Rivera*, the record here demonstrates that the arresting officers chose not to collect evidence of Krosch's alcohol concentration and did not lose, destroy, or otherwise fail

to preserve the evidence. Because the state did not collect the evidence at issue, it could not possibly have had a duty to preserve it. We therefore reject Krosch's argument that this case involves the state's constitutional duty to preserve evidence.

■ We now move on to address the question of whether the state's failure to conduct an alcohol-concentration test deprived Krosch of due process of law. Our decision on this issue is guided by that of the United States Supreme Court in *Youngblood*. In *Youngblood*, a case that dealt principally with the state's failure to preserve semen samples in a prosecution for child molestation, sexual assault, and kidnapping, the Court also discussed the state's failure to perform a particular kind of test on the samples. 488 U.S. at 58, 109 S.Ct. 333. Responding to the lower court's somewhat oblique reference to the state's "inability to quantitatively test" the samples, the Court stated:

> If the [lower] court meant by this statement that the Due Process Clause is violated when the police fail to use a particular investigatory tool, we strongly disagree. The situation here is no different than a prosecution for drunken driving that rests on police observation alone; the defendant is free to argue to the finder of fact that a breathalyzer test might have been exculpatory, but the police do not have a constitutional duty to perform any particular tests.

*Youngblood*, 488 U.S. at 58–59, 109 S.Ct. 333.

As in the example offered by the Court in *Youngblood*, Krosch was free to and, in fact, did present evidence with respect to his drinking habits, the amount of alcohol he consumed before he killed Applebee and Kabtyimer, and the effects of his alcohol consumption on his mental state. The police did not, however, have a constitutional duty to perform an alcohol-concen-

tration test. *See id.* at 59, 109 S.Ct. 333. Thus, we conclude that Krosch has not established a due process violation.

## II.

■ Krosch also claims that the trial court improperly denied his request for a jury instruction to the effect that, had the arresting officers tested his alcohol concentration, the test would have produced evidence unfavorable to the state. Krosch requested the instruction on the ground that it was an appropriate sanction for the state's failure to conduct the test.

■ A refusal to give a requested jury instruction lies within the discretion of the trial court and no error results unless an abuse of discretion is shown. *State v. Broulik,* 606 N.W.2d 64, 68 (Minn.2000); *State v. Blasus,* 445 N.W.2d 535, 542 (Minn.1989). Given our holding that the state was under no obligation to conduct an alcohol-concentration test in this case, we conclude that the trial court's refusal to give the proposed jury instruction was not an abuse of discretion.

## III.

■ Finally, we turn to Krosch's pro se supplemental brief, which sets forth nine separate allegations of wrongdoing by trial counsel and the trial court. The brief contains no argument or citation to legal authority in support of the allegations and we therefore deem them waived. *See State v. Ture,* 632 N.W.2d 621, 632 (Minn. 2001); *McKenzie v. State,* 583 N.W.2d 744, 746 n. 1 (Minn.1998); *Louden v. Louden,* 221 Minn. 338, 339, 22 N.W.2d 164, 166 (1946) ("An assignment of error based on mere assertion and not supported by any argument or authorities in appellant's brief is waived and will not be considered on

appeal unless prejudicial error is obvious on mere inspection.").

Affirmed.